

## Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2                 HOUSTON DIVISION

3
   UNITED STATES OF AMERICA,  *
4                             *
        Plaintiff,            *
5                             *
   VS.                        *  Case No. 4:17-cv-01164
6                             *
   CHRIS C. ULASI, MICHAEL    *
7  UMEORAH, ANGELA UMEORAH    *
   NINA U. DENCHUKWU, and     *
8  OCWEN LOAN SERVICING, LLC  *
                              *
9       Defendants.           *

10

11       *********************************
12                 THE ORAL
                DEPOSITION OF
13             ANGELA UMEORAH
                MARCH 15, 2018
14       *********************************

15

16       ORAL DEPOSITION OF ANGELA UMEORAH, produced as a

17  witness at the instance of the PLAINTIFF, and duly

18  sworn, was taken in the above-styled and numbered

19  cause on the 15th of March, 2018, from 9:47 a.m. to

20  12:54 p.m., before Debbie Boothe, CSR, in and for the

21  State of Texas, reported by machine shorthand at the

22  U.S. Attorney's Office, 1000 Louisiana, Suite 2300,

23  Houston, Texas 77002, pursuant to the Federal Rules of

24  Civil Procedure and the provisions stated in the record

25  or attached hereto.
```

## Page 2

```
1        A P P E A R A N C E S

2
   FOR THE PLAINTIFF:
3
      Ms. Stephanie M. Page
4     United States Department of Justice
      Tax Division
5     717 N. Harwood Street, Suite 400
      Dallas, Texas  75201
6     (214) 880-9721   (214) 880-9774
      stephanie.m.page@usdoj.gov
7
8  FOR THE DEFENDANTS CHRIS C. ULASI AND NINA U. DENCHUKWU:
9     Mr. Floyd E. James, Sr. (Not Present)
      Floyd E. James, Sr. & Associates, P.C.
10    6200 Savoy, Suite 260
      Houston, Texas  77036
11    (713) 981-8600   (713) 334-3270
      floydlaw@sbcglobal.net
12
13 FOR THE DEFENDANTS MICHAEL UMEORAH AND ANGELA UMEORAH:
14    Mr. Cornel A. Williams
      Cornel A. Williams & Associates
15    1405 Palm Street
      Houston, Texas  77004-5740
16    (713) 520-5153   (713) 524-4528 Facsimile
      willassoc@aol.com
17
18       * * * * * *
19
20
21
22
23
24
25
```

Government
Exhibit

G

## Page 3

```
1                     INDEX

2
3  WITNESS:  ANGELA UMEORAH
4                          PAGE
5  Appearances                    2
6  Examination by Ms. Stephanie M. Page      8
7    9:47 a.m. - 11:50 a.m.
8    11:59 a.m. - 12:54 p.m.
9  Changes and Signature          130
10 Reporter's Certificate         132
11
12       *  *  *  *  *  *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1            EXHIBIT INDEX
2  NUMBER      DESCRIPTION              PAGE
3  Exhibit 1   Amended Disclosure Statement of
4              Jubilee Group Homes, Inc.      29
5  Exhibit 2   United States Bankruptcy Court
6              Southern District of Texas
7              Houston Division, Voluntary
8              Petition Jubilee Group Homes, Inc.  29
9  Exhibit 3   Wells Fargo Business Account
10             Application Jubilee Group Homes,
11             Inc. Account Number Redac8681    60
12 Exhibit 4   Wells Fargo Basic Business Checking
13             Jubilee Group Homes, Inc.
14             Account Number Redac8681         61
15 Exhibit 5   Wells Fargo Business Account
16             Application Jubilee Group Homes,
17             Inc. Account Number Redac8381    64
18 Exhibit 6   Wells Fargo Combined Statement
19             of Accounts Jubilee Group Homes,
20             Inc. Account Number Redac9381 and
21             Redac8895                        66
22 Exhibit 7   Wells Fargo Business Account
23             Application Jubilee Group Homes,
24             Inc. Account Number Redac9147    71
25
```

Page 9

1   A. The bank statements, I looked at them again.
2   Q. Okay. And these are bank --
3       MR. WILLIAMS: What else? She's talking
4   about everything.
5       THE WITNESS: Oh.
6   Q. (BY MS. PAGE) In preparation for this
7   deposition --
8   A. Yes.
9   Q. -- you looked at the bank statements that your
10  attorney had?
11  A. And I looked at the interrogatories as well. I
12  did look at the interrogatories as well.
13  Q. Your answers to the interrogatories, is that
14  what you're talking about?
15  A. Yeah. Yes.
16  Q. Okay. Have you ever had your deposition taken
17  before?
18  A. No.
19  Q. So as you know, you're testifying under oath.
20  If you need a break, just let me know, and we will take
21  one as soon as convenient. However, if I ask a
22  question, I will ask that you answer the question before
23  we take a break. If you don't hear or understand the
24  question, let me know, and I'll repeat it.
25  A. Okay.

Page 10

1   Q. If you answer a question, I will assume that
2   you've heard it and understood it. Is that --
3   A. (Witness nodding head.)
4   Q. Okay. Please answer verbally -- no head
5   nods -- so that she can get that on the record.
6   A. All right.
7   Q. Are you familiar with the lawsuit that was
8   filed by the United States against Jubilee Home Care --
9   A. Yes.
10  Q. -- Health Home Care?
11  A. Yes.
12  Q. And what's your understanding of that lawsuit?
13  A. That there was some trust fund that was not
14  paid back to the government, and part of us are being
15  sued regarding that trust fund.
16  Q. The trust fund recovery penalty?
17  A. Yes.
18  Q. And also there's income tax liability that's
19  being -- that's part of the suit?
20  A. Yes.
21  Q. There's also -- there was also a suit that the
22  government filed against Jubilee, not you the
23  individuals, but against Jubilee. It was an injunction
24  lawsuit. Do you recall that?
25  A. There's one -- there was one that I know that

Page 11

1   we -- we just got resolution, Jubilee got a resolution.
2   And my husband, actually, is going to go make the
3   initial payment, I think.
4   Q. Okay. So there was an agreed judgment in that?
5   A. Uh-huh. Uh-huh.
6   Q. And was it a suit to enjoin Jubilee or to order
7   Jubilee to make tax deposits, payroll tax deposits?
8   A. The way I understand the particular suit, it
9   was a suit against some taxes that Jubilee owed, and an
10  agreement was reached. And the way for Jubilee to pay
11  off that debt was agreed upon.
12  Q. Okay.
13  A. Actually, my husband has been paying that.
14  He's been making that payment. Then he stopped for a
15  while because he didn't know where that case was going,
16  but then now we've received a final judgment. The Court
17  has said, "Okay. Jubilee, pay this amount," and they've
18  agreed on the installment -- installment payment, and
19  he's going off to do that first payment today.
20  Q. Are you talking about he's -- he's entered some
21  agreement to pay back taxes?
22  A. This is with Jubilee; right? He's the one --
23  Q. Jubilee, right.
24  A. Yeah. He will be the one to answer exactly,
25  but this is my understanding. My understanding is that

Page 12

1   one, it didn't involve us. It was for Jubilee as a
2   corporate entity. And there was some back taxes, and an
3   agreement was reached on a payoff and the way to pay
4   that off. And he just recently got that agreement.
5   Q. Okay.
6   A. And today he's making -- actually, he went to
7   make the first payment, because I think he said it had
8   to be in before Monday, you know, in the daytime.
9   Q. Okay. Well, I will ask him about that.
10  A. He will know. He will give you better details,
11  but I know that agreement was just reached recently. He
12  just got that in the mail.
13  Q. Is Jubilee making its payroll taxes currently?
14  A. Since my husband started handling it, he's
15  making it as when due on -- on the taxes.
16  Q. And when did your husband start handling it?
17  A. When he came back, some point between 2014 and
18  2015 -- hold on. Let me get that right. He came back
19  in 2016, and I think it's after that that he started
20  handling it, after he came back.
21  Q. Okay. So Mr. Umeorah --
22  A. At some point in 2016, 2017. He will be better
23  able to tell you. But between 2016 and 2017 when, in
24  fact, he took over paying the taxes, it has been paid
25  when due.

Page 17

1    Q. Uh-huh.

2    A. I have a license for registered nurse.

3    Q. And can you tell me when you got that?

4    A. 1990 or '92, in there.

5    Q. Okay.

6    A. And then I have my advanced practice nurse,

7  like I have another license to be a nurse practitioner.

8    Q. And you got that in 2016?

9    A. Yes, ma'am.

10   Q. Okay. Let me ask you about your -- your

11 employment history.

12   A. Okay.

13   Q. Starting with -- let's start with when you came

14 to the United States.

15   A. All right.

16   Q. So that's about 1990?

17   A. 1988.

18   Q. Okay. So if you can just tell me where you

19 worked, what you did --

20   A. All right. Okay.

21   Q. -- the best you can.

22   A. I remember most of it. I mean, it's a lot, but

23 I remember. So I came in 1988. We opened an African

24 food store. We kind of opened an African food store not

25 too long from there. Like about 1988, '89, we opened an

Page 18

1  African food store. So we were working there in our

2  food store. I went to nursing school while we operated

3  that store. So I was working at the food store and

4  going to nursing school.

5        So when I graduated from nursing school, my

6  very first employment was at the Methodist Hospital in

7  the ICU. So I worked at the Methodist Hospital ICU. I

8  transferred and started working PRN at --

9        MR. WILLIAMS: She's trying to figure out

10 the times.

11       THE WITNESS: Oh, the time frames as well.

12   Q. (BY MS. PAGE) Let me just interrupt. Did your

13 husband and you open the African food store --

14   A. Uh-huh.

15   Q. -- or was it --

16   A. No, we opened it.

17   Q. Just you two?

18   A. Yeah.

19   Q. Okay. All right. So Methodist Hospital ICU?

20   A. So that would be like from -- and I can't be

21 sure of the dates now. So in 1990, I got my license. I

22 went in there right away. So between there -- I didn't

23 stay up to a year even. So between 1990, 1991, I was

24 there. I mean, but remember now, even as I worked as a

25 nurse, I also worked at the store. I mean, you know, I

Page 19

1  still worked at the store my off days and all that. If

2  my husband traveled, I worked there as well. So I

3  worked both jobs.

4        I went to West Houston. That name has

5  changed now. It's no longer West Houston. It's owned

6  by the HCA, Columbia HCA Community, part of their

7  hospital. So I was at West Houston, and it is -- it's a

8  hospital, and I was working PRN. I worked PRN there.

9        And then in there as well, while I was

10 working there, we opened -- I think at that time we

11 opened Jubilee, 1992, '93 or so, there around. I'm not

12 too sure of the dates now. So we opened Jubilee, and

13 then I was the nurse there. I was acting as the nurse

14 for Jubilee as well as, you know, being part of the

15 owner.

16       Some point there, we also opened -- I'm

17 trying to think. So at that time I basically wasn't

18 working for any hospitals. I working Jubilee, working

19 our food store and I believe up until -- when I left,

20 when I left in 2004. Then --

21   Q. Okay. 2004 you left where?

22   A. I left, went back home. I took my child,

23 everything, we moved back to Nigeria.

24   Q. Went to Nigeria?

25   A. Yes.

Page 20

1    Q. So did your husband also move?

2    A. My husband moved but not immediately. Myself

3  and my son went first. He didn't move, I believe, until

4  like 2006. And I think, you know, that's correct.

5    Q. Okay. Why did you go back to Nigeria?

6    A. My family -- my dad had so much going on in his

7  businesses, and he needed help, needed, you know, for us

8  to help him to run some businesses and some family

9  issues.

10   Q. Okay. So what did you do in Nigeria?

11   A. So I helped my dad. He had several businesses.

12 So I worked with him mostly. That's mostly what I did,

13 helped him run his affairs.

14   Q. And how old was your son when you moved?

15   A. Chikem was 4 years old.

16   Q. Okay.

17   A. So we mostly worked for my dad, but we had --

18 when my husband came, we then had some other businesses

19 we ran as well.

20   Q. In Nigeria?

21   A. Yes.

22   Q. What kind of businesses were they?

23   A. We dabbled into trying to make noodles.

24   Q. Okay. So when did you move back to the

25 United States?

Page 21

1    A. In -- anyway -- no, there's another part to it.
2  So when I was there in Nigeria, right, I would come
3  back. And I think I didn't come back -- there was like
4  a period of three, four, five years I never even came
5  back. Then I started coming back when things got a bit
6  rough there, so then coming back and working as a nurse.
7    So -- and I'll tell you where I worked at
8  that time. But I believe I started coming either 2009
9  or 2010 as visiting, but it would mainly be when my son
10  is on holidays, like during the summer, maybe Christmas
11  break. And when I came, I worked at the hospital --
12  what's the name of the hospital now that closed down.
13  It's a psyche hospital, Riverside. So I got a contract
14  with Riverside. Up through that period I was in
15  Nigeria, I mainly worked for them.
16    So whenever I come in, they'll give me a
17  contract, Riverside General Hospital. So I worked for
18  them. And I believe, also, there's another agency I
19  would take some shifts from and work for that agency as
20  well.
21    Q. And what time period was this that you --
22    A. Sorry?
23    Q. What timed period were you working as a
24  contract nurse?
25    A. Oh, it was -- from that -- when I started doing

Page 22

1  it, I did it from about 2009 until I came back finally,
2  but it would be only on holidays.
3    Q. Okay.
4    A. It would only be when my son could come with
5  me, which was sometimes over the summer, sometimes
6  during Christmas breaks.
7    Q. Was your son registered in school there?
8    A. My son actually attended American International
9  School in Lagos, and he -- yeah.
10    Q. Where is Lagos?
11    A. Lagos is a -- it used to be the capital city of
12  Nigeria before they moved it to Abuja, but now it's like
13  the commercial heart.
14    Q. Okay. So from what year to what year did your
15  son attend?
16    A. He started first grade there in 2004. No,
17  not -- he started pre-K. He was 4. He started pre-K
18  there in 2004, and he was there all the way to sixth
19  grade.
20    Q. Okay. And then what happened after sixth
21  grade?
22    A. No -- we came here.
23    Q. Okay.
24    A. Yeah.
25    Q. So when -- when did you move back here?

Page 23

1    A. 2012.
2    Q. Okay. You mentioned that your husband -- how
3  long did your hus -- did your husband always live here
4  or --
5    A. Oh, no. When he moved in 2006, he lived in
6  Nigeria. We both were there. As a matter -- yeah.
7    Q. Okay. So this -- Old Windsor, were you living
8  in -- when did you move into Old Windsor?
9    A. 2000.
10    Q. And you still live there?
11    A. Yes.
12    Q. Did you ever rent out Old Windsor?
13    A. Uh-uh.
14    Q. So Old Windsor -- what happened to the Old
15  Windsor house while you were --
16    A. While we were there, we kept the house. And,
17  you know, we had a family that would go check our mail
18  and stuff, but we kept our house.
19    Q. Okay. So you just said that your husband moved
20  to Nigeria --
21    A. 2006.
22    Q. -- in 2006?
23    A. Yes.
24    Q. Until when?
25    A. He came back -- we came back before him. So we

Page 24

1  came back in 2012, and I believe he came back 2014.
2    Q. So when Jubilee -- you said Jubilee opened in
3  1992?
4    A. I'm not exactly sure now. Like don't hold me
5  to it, but I know that I had graduated from nursing
6  school. I was a nurse. So in between there, in between
7  1992 and 1996, you know, somewhere in there we opened
8  Jubilee. And, you know, I have to go back. I didn't go
9  refresh in my mind exactly when it opened. But it's in
10  there, in between when I got out of school in 1992 to,
11  you know, 1996, somewhere in there.
12    Q. And how did that company come to be formed, or
13  how did you get involved in that company?
14    A. So Jubilee Group Homes, we -- the idea came
15  from me and my husband. And at the time, you know,
16  Dr. Chris Ulasi was my husband's childhood friend, and
17  we were very close. So we -- when we got the idea for
18  this business, we asked him to join us in the business.
19  And I'm not sure now whether the wife was there from the
20  beginning, you know, but she also was there. So she
21  joined as well. So --
22    Q. And who is -- okay. So you're talking about
23  Chris Ulasi?
24    A. Yes.
25    Q. Or Ulasi?

Angela Umeorah

Page 25

1    **A.  Yes.**

2    Q.  And his wife --

3    **A.  Yes.**

4    Q.  -- what's her name?

5    **A.  Nina.**

6    Q.  Nina?

7    **A.  Denchukwu.**

8    Q.  Does she go by --

9    **A.  Denchukwu.**

10   Q.  Okay.  So it was you and your husband's idea to

11   form the company sometime in the '90s?

12   **A.  Yes, and both of them joined.  But they were**

13   **there from the beginning.  So all of us joined and**

14   **formed the company.  We just started the company and got**

15   **it going.**

16   Q.  And what was the purpose of the company?

17   **A.  We kept -- it was like -- it's a group home.**

18   **So we keep homes for the mentally retarded that come out**

19   **of the state schools.**

20   Q.  Were you an owner of the company?

21   **A.  Yes, I'm the owner.**

22   Q.  Are you still a part owner?

23   **A.  Yes.**

24   Q.  Who else are owners?

25   **A.  Michael, Chris and Nina.**

Page 26

1    Q.  Are you also an officer?

2    **A.  I mean, I don't run it day-to-day, you know.**

3    **My name is there, but I don't -- I'm not -- yeah.  You**

4    **know, I do some things for them.  I guess I'm an**

5    **officer.  You can put it that way.**

6    Q.  And have you been an officer throughout the

7    opening till now?

8    **A.  By the time -- when I traveled and I wasn't**

9    **here, I was -- my name wasn't even there.  I did**

10   **nothing.  I wasn't part of that business anymore when I**

11   **was out.  From beginning of -- even after I came back, I**

12   **wasn't part of it.  Beginning 2004 when I left, until**

13   **2014 or '16, in there, whenever my name came back into**

14   **the company, was when I started knowing what was going**

15   **on.**

16   **So I know we have a signature card when I**

17   **our names went back to be a signatory in the business.**

18   **That is when I could look to even see what was going on.**

19   **Before that time, you know, I knew nothing.  My name was**

20   **no longer there.**

21   Q.  But you never -- you were always a director.

22   You never -- I can't think of the word -- you never quit

23   being a director?  You never formally quit and said "I'm

24   not going to be a director" during that time period?

25   **A.  I never wrote a letter, but inadvertently my**

Page 27

1    **name was removed from the account.**

2    Q.  Okay.

3    **A.  And I never submitted a letter to say,**

4    **"Look" --**

5    Q.  Resigned, that's the word I'm looking for.

6    **A.  Yes.  I never submitted a letter to resign, but**

7    **I was -- my name was removed from operations of the**

8    **bank.  Operations of the company, my name was removed.**

9    Q.  In the beginning of the business -- when I

10   refer to "business" or "company," I'm referring to

11   Jubilee Group Homes, Inc.

12   **A.  Uh-huh.  I understand.**

13   Q.  How many offices or how many divisions did

14   Group Home -- did Jubilee have, and where were they?

15   **A.  So Jubilee opened in Houston; and then a**

16   **Corpus Christi branch was opened; a McAllen branch was**

17   **opened in the Valley; a Beaumont branch was opened.**

18   Q.  Were they all opened at the same time?

19   **A.  No.  Houston was first, and then the others**

20   **followed but one at a time.**

21   Q.  And part of the business was finding homes to

22   place the patients; is that correct?

23   **A.  Yes.**

24   Q.  Did you own any of the -- you or your husband

25   own any of the homes?

Page 28

1    **A.  They were put variously in our names, yes.**

2    **Yes, we did.**

3    Q.  Okay.  And did Jubilee pay rent to you --

4    **A.  No.**

5    Q.  -- on the homes?

6    **A.  No.  No.**

7    Q.  Okay.  Let's go through these homes.  The

8    Hidden Valley home --

9    **A.  I wouldn't remember which one is in my name,**

10   **which one I owned.  I wouldn't remember, if that's the**

11   **question.**

12   MR. WILLIAMS:  Let her ask the question

13   first.

14   THE WITNESS:  Oh, okay.  All right.  Go

15   ahead.

16   Q.  (BY MS. PAGE) So you don't remember --

17   **A.  I remember the home, but if it's -- but I**

18   **couldn't tell you now whether that one was in my name or**

19   **Michael's name.  I'm sorry.  If it that's your question,**

20   **I couldn't tell.**

21   Q.  So did you or Michael own Hidden Valley, that

22   property?

23   **A.  Like I said, right, I know I owned some, I know**

24   **Michael owned some.  I don't know which one is which,**

25   **which one that I owned or which one Michael owned.  But**

Page 29

1  I know that there are records.  Anyone that say that I
2  owned, that was in my name was in my name.  But I don't
3  know whether it was Spring Valley or Hidden or the
4  particular address, right?  I can't remember.
5       Q.  Okay.
6            MS. PAGE:  Okay.  Let's go ahead and mark
7  this.  Let's go ahead and get this one marked as
8  Exhibit 1.
9            (Exhibit 1 marked.)
10      Q.  (BY MS. PAGE) Ms. Umeorah, you're aware that
11  the company filed bankruptcy at some point?
12      A.  You know, I was told.  I wasn't part of that
13  filing.
14      Q.  Okay.  Let's put this aside.  I gave you the
15  wrong thing.
16            MS. PAGE:  I want to get that marked as
17  Exhibit 2.  And we'll just put Exhibit 1 to the side for
18  a minute.
19            (Exhibit 2 marked.)
20      Q.  (BY MS. PAGE) Now, Exhibit 2, I don't know if
21  you're familiar with this or not.  This is a petition
22  and the schedules that were filed in Jubilee's
23  bankruptcy.
24      A.  Okay.
25      Q.  So let's move to Page 15.  It's at the top, it

Page 30

1  says Page 15 of 34.  Does this refresh your memory of
2  the properties that were in your name?
3       A.  So like Belfast was in my name, I guess.
4       Q.  I don't know.
5       A.  Or was it?  I think -- you know, like I said,
6  some are in my name.  So if it says --
7            THE WITNESS:  Is that what that says,
8  Belfast?
9            MR. WILLIAMS:  That's what this is saying.
10           THE WITNESS:  Oh, yeah.  So, yes.
11           MR. WILLIAMS:  Is it permissible to explain
12  to her what this is, what she's looking at, so she
13  can --
14           MS. PAGE:  I'll explain it.
15           MR. WILLIAMS:  Okay.  Good enough.
16      Q.  (BY MS. PAGE) Okay.  So this here is a schedule
17  to the bankruptcy petition that was filed by Jubilee,
18  and it's showing all of the leases or contracts that
19  Jubilee had --
20      A.  Okay.
21      Q.  -- and the parties that it had the leases or
22  contracts with.  And so this is -- this was filed in the
23  bankruptcy by Jubilee.  So the first -- that's
24  what this is.
25           And if you can just look through here and

Page 31

1  see if, you know, this refreshes your memory or if you
2  believe it's possible that these three businesses -- I
3  mean, these three homes that you had a lease with
4  Jubilee that you were a party to the lease; is that
5  correct?
6       A.  So let me understand.  Is it saying that for
7  Belfast I owe?  Is all of these ones as well?  Is it
8  just only Belfast?
9       Q.  It looks like --
10      A.  It looks like only Belfast.
11           MR. WILLIAMS:  It looks like these three,
12  it looks like.
13      Q.  (BY MS. PAGE) Do you recall an address with
14  Wolfe?
15      A.  Oh, yeah.  Yeah, I recall those names.  So it's
16  saying these three homes, right --
17      Q.  Right.
18      A.  -- were in my name?
19      Q.  I'm asking you.
20      A.  Yeah.  Yes, I agree.
21      Q.  I mean --
22      A.  Yeah.
23           MR. WILLIAMS:  If you remember, now.
24      A.  Oh, I do remember.  Like I say, I remember that
25  I know some of those homes were bought in my name, and

Page 32

1  this will be correct.
2       Q.  (BY MS. PAGE) Okay.  And then Mr. Ulasi also
3  had some leases with Jubilee.  See below that there's a
4  Bassford Drive and a Clint in Beaumont?
5       A.  Uh-huh.
6       Q.  Would these addresses be homes that --
7       A.  Oh, yes.  All of these are homes that we will
8  put the clients in, yes.
9       Q.  Okay.
10      A.  And, I mean, I remember those addresses.
11      Q.  Okay.  And Eduardo Vivanco, do you know who
12  that is?
13      A.  I think he is our manager in McAllen.  And I'm
14  not 100 percent sure.  Is that address McAllen or
15  is that -- no, it's Houston.  I don't know who that is
16  if that's Houston.  I don't know who that is at all.
17      Q.  Okay.  So the next page, Page 16, it lists
18  three -- the bankruptcy, the schedule lists three
19  properties, Spring Grove, Houston; Hidden Valley,
20  Beaumont; Victoria Park, Corpus Christi with
21  Michael Umeorah being a party to this.
22      A.  Okay.
23      Q.  Does that sound --
24      A.  Uh-huh.
25      Q.  -- correct or possible?

Angela Umeorah

Page 33

1    A. Yeah.

2    Q. So Spring Grove, would that be a home that you

3 placed clients in?

4    A. It was a home to start with, I believe. Yeah,

5 it was a home and also an office.

6    Q. So did your husband own this property,

7 Spring Grove?

8    A. Uh-huh.

9    Q. Does he still own it?

10    A. Uh-uh. No.

11    Q. No?

12    A. It was foreclosed.

13    Q. Okay. It was foreclosed when? Do you know

14 when it was foreclosed?

15    A. I was already back here. I'm not sure of the

16 date now.

17    Q. So how long did -- was this the office for

18 Jubilee from the beginning?

19    A. Oh, no. No. From the beginning, Jubilee had

20 another office. And I've forgotten the address, but

21 it's on Southwest Freeway.

22    Q. And then where did it move next?

23    A. I believe from there -- I'm not 100 -- I think

24 from there it went to Spring Grove. I am not sure now

25 if it went somewhere else before Spring Grove.

Page 34

1    Q. And now where is it? Did it -- after

2 Spring Grove, where did the office move?

3    A. Beaumont. So the office is basically in

4 Beaumont, the part of the company that's still open.

5    Q. What's the address in Beaumont?

6    A. I don't know, but Michael would know. I've

7 been there, but Michael will know the address.

8    Q. And then Nina -- below that, there's four

9 properties, Emily, Elk Drive, Mountainview, Flagstaff.

10 Those are the street names. Do you recognize those

11 names?

12    A. I do.

13    Q. And what are those?

14    A. All of these are homes. These ones are all

15 homes in those places as well where we kept -- you know,

16 where clients lived.

17    Q. And did Jubilee pay rent, or were there rent

18 to -- in regards to these homes?

19    A. You know, there's a way business runs. Like

20 the clients are supposed to pay their own rent. So the

21 clients pay their rent. That's how it's supposed to be.

22 But I know that Jubilee -- some of the clients didn't

23 have enough money that Jubilee would pay. So --

24    Q. But who would they pay, Nina?

25    A. Oh, no. They would pay the mortgage company.

Page 35

1    Q. But -- but Nina would be the owner of these

2 homes; correct?

3    A. She bought the homes, yes.

4    Q. So they would pay the rent to Nina?

5    A. I mean, but remember now, the company --

6 Jubilee will collect those monies from the clients and

7 pay.

8    Q. Okay. But Nina would receive some rent because

9 you said before that you didn't receive any rent?

10    A. Nina didn't receive any either. You know, the

11 rent -- this is how it works. So we bought it, rented

12 our home. The house in our names, right, and every

13 month -- there can only be three clients. The clients

14 will pay the company for room and board. So they will

15 pay whatever is assessed them. Depending on how many

16 are there, they will pay that amount of money. It's

17 supposed to cover room and board. They will pay into

18 the company, and from there the company will pay the

19 mortgage.

20    Q. For whoever owned the property?

21    A. Yes.

22    Q. Okay. So these three -- Belfast -- I'm back on

23 Page 15 -- the Belfast address or home, the Wolfe home

24 and the Keystone home, at some point they were in your

25 name?

Page 36

1    A. (Witness nodding head.)

2    Q. And --

3    A. Yes.

4    Q. -- do you know when -- were they sold, or what

5 happened to these three pieces of property?

6    A. By the time these were happening, I had left.

7 I wasn't -- I wasn't part of the business in terms of

8 running it, you know. So when they were sold, I was

9 already in Nigeria. When they were foreclosed and all

10 of that, I wasn't even here. I wasn't even aware of the

11 bankruptcy either.

12    Q. Do you -- do you know if they were sold or

13 foreclosed, these three?

14        MR. WILLIAMS: If you know. Just what you

15 know.

16    A. I know. You know, because sometimes I'll get

17 notices about the foreclosures. So I know, but I can't

18 specifically now say this was sold or this was

19 foreclosed. I think they were mainly foreclosed.

20    Q. (BY MS. PAGE) Okay.

21    A. I don't believe they were sold, but then I

22 can't -- I can't swear to that. I believe they were

23 foreclosed.

24        MR. WILLIAMS: Just answer what you know.

25    A. That's what I'm saying. I'm saying -- I'm just

Angela Umeorah

Page 37

1  saying you -- telling you what I know.
2    Q.  (BY MS. PAGE) I think you said that at some
3  point -- well, the only office that's left is Beaumont.
4  Why did the other divisions or branches close?
5    A.  Corpus Christi closed -- I had already left,
6  but Michael was still there, so he was part of the
7  closing.  It closed because the principal officer that
8  we employed that was handling that branch, we had found
9  one thing.
10    Q.  Found what?
11    A.  One -- they had gone in and started meddling
12  with the funds of the clients.
13    Q.  Now, who were these people?
14    A.  Debbie Hovda and Victor -- I forgot his last
15  name.
16    Q.  And Victor?
17    A.  Yes.  I've just forgotten Victor's last name
18  now.  But Michael was there as it was winding down.
19    Q.  And when did you say Michael went back to
20  Nigeria?
21    A.  2006.
22    Q.  Do you know why the company filed bankruptcy?
23    A.  No, because I had left.  I wasn't here.  I
24  wasn't part of the -- I didn't know what was going on in
25  the company then, and I wasn't being informed either.

Page 38

1    Q.  So you weren't aware of the bankruptcy until
2  now?
3    A.  No.  I learned way after the fact.
4    Q.  Did the company have problems with payroll
5  taxes when you were -- prior to your moving to Nigeria?
6    A.  I believe so.  But, you know, they were
7  making -- they were being paid but not when due, and I
8  know there were issues.  But, you know, it was being
9  paid not as when due but being paid.
10    Q.  Okay.  What were your duties at Jubilee?
11    A.  At the time that I was at Jubilee, I was like
12  the primary nurse.
13    Q.  Did you receive a salary?
14    A.  Yes.
15    Q.  And which divisions did you work at?
16    A.  Oh, here in Houston.
17    Q.  So you were at the main office?
18    A.  Yes.  But, I mean, I was -- yeah.
19    Q.  Main office?
20    A.  Yeah.  But I would still oversee, you know, the
21  other parts.  I would still talk to them, or they could
22  still call me for questions and stuff.
23    Q.  You would oversee --
24    A.  Like Corpus Christi could call me.  Any one of
25  them could call me, but I mainly saw the patients in

Page 39

1  Houston.
2    Q.  Okay.
3    A.  So I wasn't the nurse.  They hired other
4  nurses.  Like in Corpus Christi, Beaumont, McAllen had
5  nurses that they hired.
6    Q.  So did you have an office at the main office?
7  I'm assuming that was at --
8    A.  Southwest Freeway.
9    Q.  Southwest Freeway?
10    A.  I forgot the address.  I think it's something
11  something Southwest Freeway.
12    Q.  So you had an office there?
13    A.  (Witness nodding head.)
14    Q.  And would you say you worked there 40 hours a
15  week or --
16    A.  (Witness nodding head.)
17    Q.  So it was a full-time job?
18    A.  Yes.  Oh, yes.  I forgot.  Yes.
19    Q.  And that time period -- oh, my goodness.  When
20  did -- did you and your husband eventually sell the
21  store?
22    A.  As my husband was leaving, 2006, he sold it.
23    Q.  Okay.  So how long were you -- you were a
24  full-time nurse -- I'm sorry.  I need to go back.  Let's
25  see here.

Page 40

1      So you were a full-time nurse when Jubilee
2  opened up until you left, a full-time nurse for Jubilee?
3    A.  Oh, no, I wasn't.  Even before I left, I had
4  stopped running that part of Jubilee.  They had another
5  nurse.  I had even stopped going to the office.
6    Q.  And when was that?  Why?
7    A.  You know, I think we decided to like kind of
8  leave the business for the men to do at some point in
9  there.  I don't know whether it was 2001 or '2, you
10  know, they hired another nurse.  I had stopped going to
11  the office like, you know, working there full-time.  I
12  was just doing my own thing.  When was that?  Anyway,
13  before I left.  So in there, in 2001 or '3 -- I'm
14  not sure now -- but they hired another nurse, and I had
15  stopped going and working there full-time and I started
16  doing my own things.  I'm not sure which, but it's right
17  there anywhere from 1999 or anywhere from -- actually,
18  anywhere from 2001 to 2004, before I left, I had stopped
19  working for Jub -- you know, I had stopped like going
20  there and being there, not day-to-day running.
21    Q.  So when you -- when you came back for the
22  periods that you were working as a contract nurse, did
23  you work at Jubilee also while you were back?
24    A.  No.  I -- once I left Jubilee, like working for
25  them in that 2001 or 2002, I never worked there as a

Angela Umeorah

Page 41

1  nurse.  And then even when I came back, like when I was
2  in Nigeria visiting, I didn't even know where their
3  office was or what was going on, nothing.
4      Q.  And you weren't -- the other three didn't call
5  you or visit with you about what was happening at
6  Jubilee?
7      A.  Chris will be the only one I would talk to, but
8  I didn't talk to him much.  I didn't even -- I could
9  come and stay the whole three months, I didn't even see
10  him.  So -- and when I talked to him, you know, he would
11  just say the company is there.  So I didn't have much
12  communication when I came back.  Probably none with
13  Nina, not even a phone call.  And then maybe sometimes I
14  will come, the whole three months I wouldn't see Chris
15  or talk to him or, you know, maybe I talked to him one
16  time.  I wouldn't even know what was going on, where the
17  office was.  I wouldn't go to the office there.
18      Q.  So now when you came back, what were your
19  duties?
20      A.  When I came back in 2012, I was still -- you
21  know, now I've got another PRN job, and I don't know if
22  I mentioned that one.  I started working for Texas
23  Specialty Hospital when I came back in 2012.  When I
24  came back, I worked for an agency a little bit, and then
25  I got a full -- I was actually working like seven 16s at

Page 42

1  Texas Specialty Hospital, and I worked for them.  I
2  worked full-time.  I was there every day.  At the time I
3  was working seven 16 hours.  So I was working for Texas
4  Specialty at that time, you know.
5      Q.  And you came back the 2012?
6      A.  Uh-huh.  And I started working for -- I was
7  working at the hospital.  I was using my registered
8  nurse license to work.
9      Q.  And at what time did you return to Jubilee or
10  have any -- any duties or responsibilities at Jubilee?
11      A.  So now after I came back to the country and I
12  was working, you know, privately.  So I started -- just
13  being in the community, I started having this feeling
14  that Jubilee was there and was not doing poorly like was
15  being portrayed.  So I started wanting to get back and
16  be part of the business, but it was resisted.
17      Q.  So you said you thought it was being poorly
18  portrayed?
19      A.  No.  While we were in Nigeria, right, I know my
20  husband would call Chris and ask him about the company,
21  and he would say, oh, you know, the company wasn't --
22  you know, was barely making it, he's trying to run it
23  the best he can and all that, but hedging, hedging, kind
24  of not being fully disclosing.  But then you remember,
25  we were outside.

Page 43

1      So when I came back in 2012, I started to
2  look deeper.  So when I know the company was there and
3  running, I now started making an effort to get back and
4  at least to know what is going on.  But it was resisted.
5      Q.  By who?
6      A.  Chris.
7      Q.  Why?
8      A.  I don't know.
9      Q.  How -- how did he resist it?
10      A.  I wanted -- you know, I asked questions.  I
11  wouldn't get answers.  I now wanted to see where our
12  account is, where is our account lodged, that I wanted
13  to get access to look at the accounts and see what's
14  going on.  By that time he had closed -- I think while
15  we left he closed all the accounts that had our names,
16  opened one that didn't have our names.
17      Q.  When you came back in 2012, did your husband
18  and son come back with you?
19      A.  My son came back with me, but my husband was in
20  Nigeria.  My son came back and started school, but my
21  husband was in Nigeria.
22      Q.  And where did your son start school?
23      A.  I first sent him on The Honor Roll School, and
24  then he went to Fort Settlement Middle School.
25      Q.  Fort Settlement, where is that?

Page 44

1      A.  Sugar Land.
2      Q.  And what year was that he started?  Did he --
3      A.  When we came, first he went to Honor Roll
4  School.
5      Q.  And that's --
6      A.  In Sugar Land as well, close to our house.  So
7  he went there.
8      Q.  Is that an elementary school?
9      A.  Yeah.
10      Q.  Okay.
11      A.  And then he -- it was elementary school, but I
12  think he started seventh grade there.  That's middle
13  school.  So it was middle -- it had both elementary and
14  middle school.  It doesn't have high school.  But then
15  when he moved, he moved from there and then went to the
16  school in our district.  He went to Fort Settlement
17  Middle School, and I believe either in 2012 or 2013 he
18  transferred over to Fort Settlement.
19      Q.  What year was he born?
20      A.  2000.
21      Q.  Why didn't your husband come back with you in
22  2012?
23      A.  He was there trying to make a headway, you
24  know, make a headway of things in Nigeria.
25      Q.  "Things" being what?

Angela Umeorah

Page 45

1    A. Being, you know, the business we had started.
2  It wasn't doing well.
3    Q. The noodle company?
4    A. Uh-huh. He was trying to see if he could get
5  it to work still.
6    Q. Okay. What would you say that your husband's
7  job description or duties were with Jubilee?
8    A. When?
9    Q. During the period -- really, I don't know if
10 they changed, but from the beginning of the company,
11 which is in the late '90s, until now.
12   A. So when it started, you know, my husband was
13 one of the directors. So was Chris. But my husband
14 also had Angel's Food Industries that he -- Angel's Food
15 Stores that -- you know, we still had that business. So
16 he was running it. So he will come in and out of the
17 office but -- as a director. But at that time, as I
18 remember, he didn't -- you know, he would come, he would
19 work; but, you know, I don't really know what I would
20 call his position except for like a director in the
21 company.
22   Q. Was he -- was he running the company?
23   A. At that time, no. The company was -- of the
24 four of us, Nina is the one that has like an accounting
25 degree. She did more of the running of the company,

Page 46

1  themselves running it. I was the nurse, but I was also
2  there. Chris would also come in, but he was also
3  teaching full-time. But then --
4    Q. So what was your husband's duties or what did
5  he do? Did he make decisions for the company?
6    A. The decisions was mainly jointly made at that
7  time. I wouldn't say that any one particular person
8  made all the decisions.
9    Q. Okay. At what time are you talking about?
10   A. I mean, like at the beginning.
11   Q. Until?
12   A. Until he left. Until he left.
13   Q. Okay.
14   A. But before Michael left, right, there was a
15 time me and Nina pulled out, mostly pulled out. That
16 was between -- remember the time I told you I can't
17 remember correctly, that 2001 and 2004, somewhere in
18 there myself and Nina pulled back. We pulled back, and
19 it was mainly Michael and Chris.
20   Q. That ran the business?
21   A. Yes. Yes.
22   Q. Or were the -- you know, made all the
23 decisions?
24   A. Yeah. At some point, you know, because, also,
25 me and Nina were having some internal female stuff going

Page 47

1  on. So we decided to pull, and we did pull. And that
2  is somewhere -- and I don't know exactly now -- before I
3  left. Either 2001, 2002, 2003, that short time there.
4  By that time we were in longer in Southwest Freeway.
5    Q. Now you're at Spring Grove?
6    A. You know, we moved to Spring Grove, but
7  Spring Grove was -- doesn't exist anymore.
8    Q. Okay. But the time that you --
9    A. Yes. Yes. Yes. We had moved to Spring Grove,
10 yes. So some point between 1999 and 2003, '4, myself
11 and Nina had pulled back, not -- our names were there,
12 but we had pulled back and it was Chris and Michael.
13   Q. When you pulled -- you just didn't go to the
14 office as much or --
15   A. We didn't even go.
16   Q. And was that a decision made by someone, or did
17 it just happened?
18   A. We made -- no. That decision was made.
19   Q. By all four of you?
20   A. All four of us, yes.
21   Q. All four of you got together and said --
22   A. For the interest of peace, the women should
23 just pull back.
24   Q. For the interest of what?
25   A. Peace. And, you know, so just -- yes, the

Page 48

1  women should pull back.
2    Q. Had something happened or what --
3    A. Like I said, you know, we were not agreeing.
4    Q. On how the business should run?
5    A. No. Yeah -- no. It was also personal --
6    Q. Okay.
7    A. -- personal you would call it. Personal
8  conflicts that, you know, it was -- you know, so we just
9  said it was better we move out a little bit and leave
10 the men.
11   Q. Did Nina have any other job during this -- the
12 time period -- really, I'm more interested in
13 December 2003 to March 2015. That's the periods at
14 issue here, are the --
15   A. From what time to what time?
16   Q. The end of 2003 to the beginning of March -- I
17 mean, beginning 2015.
18   A. Yeah, she had another business.
19   Q. She had another business?
20   A. Yes.
21   Q. What was that?
22   A. And, also, it was -- it's a business kind of
23 like mentally retarded but a different level. They call
24 it ICF/MR, and I might not be right. You know, ours is
25 like mentally retarded people. But before that waiver

Angela Umeorah

Page 49

1  was found, there was another waiver that dealt with, you
2  know, children that were like just vegetative kind of
3  state.  It was called ICF/MR.  They phased it out,
4  but -- you know, they phased it out, but she had bought
5  that business from somebody.
6      Q.  Okay.
7      A.  ICF/MR.  You know, it's also dealing with
8  mentally retarded people like where you keep them in
9  homes; right?
10      Q.  So it was another business that had to do with
11  placing people in homes?
12      A.  Uh-huh.
13      Q.  And she --
14      A.  Bought that business from somebody and owned
15  it.
16      Q.  During this time period?
17      A.  That period that you're talking about --
18      Q.  2002 or 2003?
19      A.  -- after we pulled back.  Uh-huh.
20      Q.  Okay.  Do you know what the name of the
21  business was?
22      A.  No.
23      Q.  Does she still have that business?
24      A.  Uh-huh.
25      Q.  She does?

Page 50

1      A.  Uh-huh.
2      Q.  Okay.  Who else is involved in that business?
3      A.  (Witness shrugging shoulders.)
4      Q.  You don't know?
5      A.  Uh-uh.
6      Q.  Okay.
7      A.  I mean, you know, I don't know how to the
8  extent that the husband is involved or not involved.
9      Q.  Who is Arvy McKinney?
10      A.  Arvy is our manager at Beaumont.
11      Q.  And how long has she been the manager there?
12      A.  From the beginning of that waiver, of that
13  Beaumont.
14      Q.  When you say "waiver," what do you mean?
15      A.  It's what they call it.  It's like a waiver,
16  like the state government and the federal government,
17  it's like a program that is established and funded for a
18  particular purpose.  And it's done through mental health
19  and mental retardation, the health services department
20  from Austin.
21      Q.  So the waiver in Beaumont could also be just
22  called the program?
23      A.  It's part of -- it's part of the Jubilee.  It's
24  the same.  The one in Beaumont, Houston, Corpus Christi,
25  McAllen is the same.

Page 51

1      Q.  The same waiver?
2      A.  Yes, it's the same program.
3      Q.  Okay.
4      A.  You can call it program.
5      Q.  And so the Beaumont program is still going on,
6  or waiver, and --
7      A.  It's still a program.  Let's maybe leave
8  waiver.  It's a still a program of mental health and
9  mental retardation.  It's still a program.
10      Q.  How many employees does Jubilee have now?
11      A.  I don't know.  I don't know how many employees
12  Jubilee has.  Michael would know.
13      Q.  Okay.  Who is Dominic O. Amaugwu?
14      A.  That's our law office -- not law office,
15  accountant.
16      Q.  Okay.  Presently?
17      A.  Yes.
18      Q.  How long -- it's Jubilee's accountant --
19      A.  Yes.
20      Q.  -- correct?
21      A.  Yes.
22      Q.  How long has he been Jubilee's accountant?
23      A.  Since I came back, you know, he's been our
24  accountant.  I'm not sure exactly when it was Chris.
25  When we were away, I think it was Chris that will answer

Page 52

1  that question the best.  He's the one that got him in
2  when he was the only one running the company.
3      Q.  What about Jackie D. Bell?
4      A.  Jackie D. Bell?
5      Q.  Do you know her?
6      A.  Is it him?  If that's the same one, there was a
7  Jackie D. Bell that used to work for Jubilee as a
8  caregiver a long time ago.  And I say he.  That's a
9  woman, and I'm not 100 percent sure.
10      Q.  What about Andra R. Harris, do you know who
11  that is?
12      A.  No.
13      Q.  Okay.  During the period at issue, which is
14  December 2003 to March 2015 --
15      A.  I'm going to right that date down.  All right.
16  Between 2003.
17      Q.  2003 to 2015 --
18      A.  All right.
19      Q.  -- how was payroll handled?
20      A.  I don't know.
21      Q.  Okay.  How was payroll handled prior to 2004?
22      A.  Prior to 2004, I believe Michael and Chris, who
23  I think they had a QuickBooks, and they would do the
24  payroll from my remember -- from what I remember.
25      Q.  Okay.  Did you ever prepare payroll?

Angela Umeorah

## Page 53

1    **A. Never.**

2    Q. Were you authorized to prepare payroll?

3    **A. I never asked to be auth -- I mean, I don't**

4    **know who would authorize me if I wanted -- no, I wasn't**

5    **authorized. I didn't do payroll or the part of payroll.**

6    Q. And did you ever make tax -- payroll tax

7    deposits?

8    **A. Uh-uh. Never.**

9    Q. Who made the payroll tax -- during this

10   period --

11   **A. I mean, the period I wasn't part of Jubilee, I**

12   **didn't know what was happening.**

13   Q. Okay. Well, during the period that you know.

14   **A. During the period I know, honestly, I don't**

15   **know because I wasn't part of that process to know who**

16   **paid it, whether it was accountants. I don't know. I**

17   **wasn't part of that department. I was mainly more into**

18   **nursing for the clients.**

19   Q. Do you know who cut the paychecks, who prepared

20   the paychecks?

21   **A. At that time, before 2003?**

22   MR. WILLIAMS: Yes.

23   **A. Maybe Chris or Michael or both of them.**

24   Q. (BY MS. PAGE) Okay. So you don't know?

25   **A. I don't know. I don't know, honestly.**

## Page 54

1    MR. WILLIAMS: It's okay to say you don't

2    know.

3    **A. I don't know. I don't remember. I don't**

4    **really remember, honestly.**

5    Q. (BY MS. PAGE) And I think you said you did

6    receive a paycheck?

7    **A. Yes, I did.**

8    Q. For --

9    **A. I was a director, and I was actually doing the**

10   **nursing part of that business at that time.**

11   Q. Did the directors receive a paycheck?

12   **A. Yes.**

13   Q. And was it a set amount, or how was that

14   determined?

15   **A. I don't remember. I don't remember.**

16   Q. Okay. But you do recall before you left that

17   there were problems with the payroll, deposits of

18   payroll taxes?

19   **A. I know that they were delayed. I know they**

20   **were being paid, but they were not being paid all the**

21   **time when due. I know there were issues, but they were**

22   **being paid.**

23   Q. Did Jubilee ever not make payroll, was not able

24   to pay the employees?

25   **A. I don't believe so.**

## Page 55

1    Q. Where did the startup money for Jubilee come

2    from?

3    **A. The four of us contributed.**

4    Q. Do you remember how much you contributed?

5    **A. I don't remember.**

6    Q. Was it equal?

7    **A. Yes.**

8    Q. Did Jubilee ever have any investors?

9    **A. No.**

10   Q. Are you aware of a duty to deposit payroll

11   taxes?

12   **A. Honestly, at the beginning of this business,**

13   **when I was part of it, I have not done this before. You**

14   **know, it came to me. I became aware of it, but I didn't**

15   **know to what extent. I didn't know all of this.**

16   Q. Do you know when you became aware?

17   **A. When there started being issues, when there**

18   **were issues, and, you know, when the IRS kept calling**

19   **us. When I came back, they're calling me more so.**

20   Q. Were you aware before you left that there were

21   payroll tax deposit problems?

22   **A. Before I left, I wasn't aware, you know,**

23   **that -- how will I put it? I know that we were paying**

24   **taxes. I know we were not paying it exactly the way we**

25   **do now. Like now, every two weeks we pay it. We didn't**

## Page 56

1    even know that was how to do it. I didn't know. So,

2    no, I didn't know, you know, the exact way I know now.

3    I know more now than I did then. Now I know the issues,

4    how it's supposed to be done. At that time, I had no

5    clue.

6    Q. Okay. So when you -- when did you -- when were

7    you aware of the issues and the duty to deposit payroll

8    taxes?

9    **A. When I came back. That's when I got into it,**

10   **when I came back.**

11   Q. Did Jubilee have a bookkeeper?

12   **A. In-house?**

13   Q. In-house.

14   **A. That was Nina's department. We didn't hire**

15   **anybody like to be -- that I remember, in-house to be an**

16   **accountant in-house. I don't remember. We didn't hire**

17   **anybody, to best of my remembrance. And I could be**

18   **wrong. As a matter of fact, I could be wrong. Whether**

19   **we had somebody in-house keeping books, I don't**

20   **remember. We always had external accountants, you know.**

21   **But they were not accountants in Jubilee, but they were**

22   **like external.**

23   Q. Where were the checkbooks kept, at the office?

24   **A. I think so. I'm not sure. Probably, most**

25   **likely.**

Page 57

1     MR. WILLIAMS:  Just --

2     A. I don't know.  I don't remember.  I don't know.

3     Q. (BY MS. PAGE) Where are they kept now?

4     A. Right now the accountant, the accountant has

5 the checkbooks.  We also have checkbooks.

6     Q. "We" being?

7     A. Michael, Chris, me, because sometimes we make

8 payments.  You know, there are some payments we make.

9     Q. What kind of payments do you-all make?

10    A. Like if they're coming to see the dentist and

11 we -- you know, from Beaumont, they come to see the

12 dentist, sometimes I will go there and write a check for

13 the dentist or Michael will go or, you know, Chris will

14 go.  But especially now, Michael does more than

15 everybody else in terms of, you know, making payments.

16    Q. You mean making payments for the patients?

17    A. Different like -- it's different things we make

18 payments for, different things.  Just the things like is

19 involved in running a business.

20    Q. Do you have the authority to hire and fire?

21    A. No.

22    Q. Did you ever hire anyone?

23    A. No.

24    Q. You didn't hire Arvy McKinney?

25    A. No.  But I think the four of us interviewed

Page 58

1 him -- sorry, the four of us interviewed her.  At that

2 beginning time, when we were fully in there, we would

3 all jointly hire or talk to a prospective applicant.

4     Q. What about now?

5     A. Oh, no.  It's different now.  I mean, since I

6 came back, and even when I left, you know, whenever I

7 told you I kind of pulled back from the company, 2001,

8 2002, in there, you know, since that time, I wasn't no

9 longer involved in the hiring or firing or anything like

10 that, no.

11    Q. Did one of the four of you write checks to

12 creditors for bills?  There had to be bills, Jubilee had

13 bills?

14    A. Yeah.  At that time we could all write checks.

15    Q. "At that time" being?

16    A. You know, before 2000 -- before 2003, right, we

17 could all write checks.  And even after I came back, I

18 could write checks.  I was paying the IRS.  I was --

19 when I came back and my name -- once my name got back

20 into the account, I was writing checks.  I started

21 writing checks whenever my name came back into the

22 account and I was again involved with the business.

23    Q. Do you know what a Form 941 is?

24    A. 941?  I'm not too familiar with the

25 different -- you know, I know 1099, because I get those.

Page 59

1 Which one is 941?

2     Q. Form 941 is the payroll tax, tax return.

3     A. Okay.  The one that the accountant gives us

4 every two weeks, like after we pay our employees, what

5 we get back; right?

6     Q. I'm not sure about that.

7         MR. WILLIAMS:  Look, don't speculate.

8     A. I don't know.  I don't know what it is.  I only

9 know 1099.  I don't know what any one of those --

10    Q. (BY MS. PAGE) Have you ever signed a tax

11 return -- any kind of tax return for Jubilee?

12    A. I don't know.  The truth is this:  When I came

13 back in 2000 -- when my name got back into the company,

14 right, when my name got back into there and I started

15 being involved with the tax issues, there were things I

16 signed and payments I made to IRS.  I even went to the

17 IRS office.  The IRS had appointed somebody that was

18 overseeing our taxes.  If they gave me anything at that

19 point to sign, I would have signed it after I came back.

20        So I don't want to say no and I would have

21 signed something.  Because I directly pulled money, you

22 know, wrote IRS checks, mailed them, went to the office

23 to see the IRS person at the main office.  I could have

24 signed something that was -- anything that was for

25 Jubilee if payments needed to be made, I could have

Page 60

1 signed it.

2     Q. And that was during specifically what period?

3     A. Whenever I came back and decided we needed to

4 go back into the company and see what's going on, and we

5 forced our way into getting our names signed onto the --

6 being, what you call, signature to the account.

7     Q. So you would say as soon as you got signature

8 authority?

9     A. Exactly.  As far as being involved and writing

10 checks and making payments, and I could have signed

11 something with the IRS.  I wouldn't have hesitated to

12 have signed anything at that time.

13    Q. Okay.  So now we're going to talk about the

14 bank accounts and look at some bank documents.

15    A. All right.

16        MS. PAGE:  Let's mark this as Exhibit 3.

17        (Exhibit 3 marked.)

18    Q. (BY MS. PAGE) Okay.  Ms. Umeorah --

19    A. Umeorah.  It's okay.  You can call me Angela.

20    Q. Okay.  Angela, I'll call you Angela.

21    A. Yeah.

22    Q. Okay.  Angela, what's been marked as Exhibit 3,

23 do you recognize this?

24    A. This is what, 2007?

25    Q. Uh-huh.

Angela Umeorah

Page 77

1  a thing showing that, and I believe it was in 2015 -- or
2  2014, towards the middle.  There are some things that if
3  I had access to, I will know exactly whenever Chris now
4  allowed us to get back into the accounts.  He left a
5  signature sheet at the Wells Fargo bank.  Me and Michael
6  went and signed it.  That's what gave us access to the
7  account.  Before that time, I didn't know what all was
8  going on.
9      Q.  Okay.  But you are a signatory to the
10 Account 8707, ending 8707; is that correct?
11     A.  Now, I think this is -- and I have to go back
12 and check -- is the checking account for Beaumont
13 business is 8707.  That's how it ends.  I'm a signature
14 to that one, 8707, after we got back.  I mean, now that
15 we're back, I'm a signature to all the accounts.
16     Q.  Okay.
17     A.  But in 2013, I wasn't.  So I know I didn't --
18 you know, this 2013 is still the date?  Yeah, 2013.  We
19 didn't -- we didn't become signatures in 2013.
20     Q.  So what is the 8707 account used for?
21     A.  It's -- the person in Beaumont, that's how --
22 what she uses to run that office.
23     Q.  Okay.
24     A.  And Jubilee will put money in there for her.
25 She will use it to sign on that office.

Page 78

1      Q.  Do any payroll checks -- are any payroll checks
2  issued from this account?
3      A.  Uh-uh.  No.
4      Q.  Which account are the payroll checks?
5      A.  8 -- this one, 8696.
6      Q.  Okay.  Well, let's -- just to complete this --
7      A.  8699.  I'm sorry.  8699, 8699.
8          MS. PAGE:  Let's get this marked, please,
9  Exhibit 12.
10         (Exhibit 12 marked.)
11     Q.  (BY MS. PAGE) Government Exhibit 12 is a
12 collection of statements that -- where we see from
13 Wells Fargo Bank regarding 8 -- the Account Number 8707.
14     A.  Yes.
15     Q.  And you just said that this is the operating
16 account of Beaumont?
17     A.  Yes.
18     Q.  Who has access to this account?
19     A.  The person that handles this account is
20 Arvy McKinney.  She's actually the only one.
21     Q.  And what does she use this account for?
22     A.  She uses it to manage that company over there.
23 So the clients' moneys that come in would go in here.
24 If Jubilee were to send her any money to pay the office
25 rent or to pay for any of the homes that the clients

Page 79

1  can't pay, they will transfer it to her here.
2      Q.  So they would transfer money out of the
3  operating account to her account so that she could use
4  it for expenses?
5      A.  (Witness nodding head.)
6      Q.  How would Jubilee know what amount to transfer?
7      A.  She will communicate.  You know, she will put
8  in a request and say that this home, this home, this
9  apartment or this needs money or these dental fees needs
10 to be paid or this office bill needs to be paid.
11     Q.  And would she usually get what she requested?
12     A.  Not all the time.
13     Q.  Who makes that decision?
14     A.  Right now it's Michael after Michael started
15 handling things.
16     Q.  So he would determine what bills she could pay?
17     A.  Yeah.  Or, you know, how to -- just whatever
18 funding is available, how to pay.  He's the one that
19 would transfer money to her.
20         MS. PAGE:  Okay.  I do have some more bank
21 statements.  Please mark this.
22         (Exhibit 13 marked.)
23     Q.  (BY MS. PAGE) Angela, can you look at what's
24 been marked as Exhibit 13 and identify this, if you
25 could.

Page 80

1      A.  Yes.  This one is the account we're operating
2  now.  But I don't recognize this statement because it's
3  dated 2007.
4      Q.  And this account ends --
5          MR. WILLIAMS:  Look at the whole --
6          THE WITNESS:  I'm looking.
7      Q.  (BY MS. PAGE) -- ends 8691; correct?
8      A.  Yes, I'm looking at it.
9          MR. WILLIAMS:  All of it, to the end.
10         THE WITNESS:  All right.
11     Q.  (BY MS. PAGE) Okay.  So looking at the last
12 page, which is 000255, it appears that you're an
13 authorized signer on this account?
14     A.  I know nothing of this account.  I mean, I know
15 of this account.  This is our account now.  As of 2013,
16 you know, however this was all gathered together, I
17 wasn't part of it.  I'm 100 percent sure.
18     Q.  And so that's not your signature?
19     A.  I mean, this one now looks like my signature
20 but -- this one looks like my signature.
21     Q.  Okay.  But you are a signer on this account?
22     A.  I am now.  That's what I'm saying, in 2000 -- I
23 mean, somebody put me there.  I'm not saying that my
24 name could not be affixed there, but I didn't know it
25 existed.  Like, you know, I didn't -- I wasn't aware it

Angela Umeorah

---

Page 81

1 existed. I didn't take part of it. I didn't know. And
2 I was not even made aware. Because in 2015 when I came
3 back, I wasn't a signature. Nobody said, "Oh, you're a
4 signature. Go there. You're a signature," no. So I
5 wasn't part of this. I don't know how this was arranged
6 or what happened or how it was put together.
7          But that looks like I signed it, but I
8 didn't sign it for -- at this time, I didn't sign it in
9 2013, and this account is our current account.
10     Q. Okay.
11     A. But I wasn't part of this in -- I mean, you
12 know, 2007 at the beginning and then you have 2013 at
13 the end. So I don't understand it.
14     Q. Okay.
15     A. What was the address of this bank? Let me see.
16 This bank, Wells Fargo was where? Is there an address
17 on it?
18          MS. PAGE: Mark this Exhibit 14.
19          (Exhibit 14 marked.)
20     Q. (BY MS. PAGE) Okay. If you'll just flip
21 through 14 and generally -- does this look like
22 statements for account number ending in 8699 from
23 Wells Fargo Bank?
24     A. Yeah.
25     Q. Does payroll come out of this account?

---

Page 82

1     A. Yes.
2     Q. And how -- how exactly does payroll get to --
3 like the paychecks get to the people in Beaumont?
4     A. Right now Dominic will do it, and then it will
5 be shipped over to Beaumont like overnight.
6     Q. Dominic is --
7     A. The accountant.
8     Q. Okay.
9     A. He will do it.
10     Q. He would do -- he would cut --
11     A. Do the payroll.
12     Q. -- the checks?
13     A. Yes.
14     Q. And how would he know what to cut?
15     A. Because it is processed and sent to him.
16     Q. It's processed by who?
17     A. The hours worked and all of that is processed
18 in Beaumont. And I'm not sure about this now -- Michael
19 probably will know -- either it's sent to Michael to
20 look through and approve before sending to Dominic.
21 That's what I'm assuming, but Michael will answer better
22 this question. But I think that's what happens.
23 Beaumont will see who works what. They will send it to
24 Michael, and Michael will send it to Dominic.
25     Q. Okay. Mr. Dominic Amaugwu, whatever his last

---

Page 83

1 name -- however you say his last name, when did he start
2 working for -- as the accountant for Jubilee?
3     A. I don't know. That happened while I was away.
4 I came back to meet him.
5     Q. And before him who processed the paychecks?
6     A. I don't know who processed it. Chris would be
7 the best person. He was the one handling all that. He
8 will answer better.
9          MS. PAGE: Okay. We're almost through
10 these bank accounts. I don't know if it's worth all
11 this paper or not, but...
12          (Exhibit 15 marked.)
13     Q. (BY MS. PAGE) She just handed you Exhibit 15,
14 which is additional bank statements from Wells Fargo for
15 an account that's ending 8699.
16     A. Yes.
17     Q. And the one question I have is: Exhibit 14,
18 the address is Spring Grove, but on Exhibit 15 Jubilee's
19 address is Puerta Vista. Do you know why that is?
20     A. I'm not sure. Chris was handling all this at
21 that time. But I know that Spring Grove used to be the
22 office, and I know that Puerta Vista is his home
23 address.
24     Q. Okay. Where do the bank statements for the
25 operating account go to now?

---

Page 84

1     A. I'm not sure. Michael would know.
2     Q. You don't know?
3     A. Uh-uh. No, I don't know.
4          MS. PAGE: I'm going to go ahead and get
5 this marked also.
6          (Exhibit 16 marked.)
7     Q. (BY MS. PAGE) Does this appear -- Exhibit 16
8 appear to be a statement for that same Wells Fargo
9 account, 8699?
10     A. Uh-huh.
11     Q. And now I notice the address is Old Windsor
12 Way?
13     A. Oh. So that's our house. Michael is having it
14 sent to our house.
15     Q. Is that because you-all don't have an office?
16     A. No, we have none, apart from Beaumont, and I
17 believe he doesn't want it to go there. Maybe they were
18 opening it, and he didn't want to go to there.
19          (Exhibit 17 marked.)
20     Q. (BY MS. PAGE) Okay. Angela, you're looking at
21 Exhibit 17 --
22     A. Yes.
23     Q. -- which is copies of checks on Jubilee's
24 account --
25     A. Yes.

---

Page 89

1  is --

2    A.  That looks like somebody in Beaumont, too.

3    Q.  And that's signed by Chris?

4    A.  Uh-huh.

5    Q.  The next page is Ashiro -- there's a check, I

6  believe, to Ashiro Jenkins.  Does this look like a

7  payroll check?

8    A.  What number?

9    Q.  Oh.  299.

10    A.  I mean, the person is in Beaumont.  But, you

11  know, that doesn't look like a stamp signature, but it's

12  in Beaumont.  Probably a payment that was made in

13  Beaumont.  So maybe somebody didn't get their check or

14  something happened.  But that person is a Beaumont

15  person.  Beaumont --

16    Q.  Could that be a paycheck?  Is that what

17  paychecks look like?

18    A.  No.  Paychecks look more like those ones -- the

19  ones you see the stamp, that's what they look like, like

20  in 295.

21    Q.  Oh, okay.

22    A.  Those ones are a stamp.  That's what they look

23  like.

24    Q.  Okay.

25    A.  And 296.

Page 90

1    Q.  And then the next two checks are signed by you,

2  and they're the IRS, Check 300, 301; and 302, is that

3  signed by Michael?

4    A.  Which page?

5    Q.  302.

6    A.  Yes.

7      MS. PAGE:  Okay.  Let's move on.

8      (Exhibit 18 marked.)

9    Q.  (BY MS. PAGE) Angela, could you look at this

10  document that's been labeled -- marked Exhibit 18 --

11    A.  Okay.

12    Q.  -- which is a bank statement, Wells Fargo

13  account number ending 2496.  Do you recognize this bank

14  account?

15    A.  Yeah.

16    Q.  What is it?

17    A.  I'm thinking that's it.  Michael set up a

18  dedicated IRS account just to make sure that we meet our

19  payments or he will take money from the excess balance

20  and put in that account; and that account, only him runs

21  it.  He just make sure that money goes to IRS.  That's

22  what that account is, I'm pretty sure it is.  It's our

23  IRS-dedicated account.

24    Q.  Okay.  Do you know when that was set up?

25    A.  Whenever he took over and was working on, you

Page 91

1  know, just getting payments made.  I'm not too sure.  He

2  would know.

3    Q.  On Page -- let's see, these are not marked.

4      On the sixth page back, there's a copy of a

5  check, and it's made out to you --

6    A.  Uh-huh.

7    Q.  -- for $500.  What is -- what would you -- do

8  you know what that is for?

9    A.  Uh-huh.

10    Q.  What's that for?

11    A.  Beaumont travel, petty cash.

12    Q.  Are you being reimbursed?

13    A.  Yes.

14    Q.  That's not a paycheck?

15    A.  No.

16    Q.  Are you getting a paycheck at this time?

17    A.  No.

18    Q.  Are you getting administrative fees at this

19  time?

20    A.  (Witness shaking head.)

21    Q.  Okay.  The next page --

22      MR. WILLIAMS:  Answer the question.

23    A.  Oh, I'm sorry.  I'm sorry.  Say that again.  Am

24  I get -- I'm not getting paid, no.  But if I do anything

25  for Jubilee that entails money, I get reimbursed.

Page 92

1    Q.  (BY MS. PAGE) Okay.  The next page is Check

2  Number 2529.

3    A.  Yes.

4    Q.  And that's made out to Michael --

5    A.  Yes.

6    Q.  -- Umeorah --

7    A.  Yes.

8    Q.  -- for $2,200.  What's this?

9    A.  He will answer, but I know.  The dentist, the

10  dental is here in Houston.  So they will come.  Somebody

11  call Michael, and the dentist wants to be paid before he

12  sees them.  And he will usually run there and give them

13  money or give them a check or something.  So that's what

14  that is, and it would be for that doctor.

15    Q.  Is this Michael's handwriting or your

16  handwriting?

17    A.  It's Michael's.

18    Q.  It's Michael's.  Okay.

19      MS. PAGE:  So we can take a break now.

20      (Recess from 11:50 a.m. to 11:59 a.m.)

21    Q.  (BY MS. PAGE) Angela, in regards to Jubilee, do

22  you know if there's ever been a time when Jubilee has

23  been able -- been unable to pay rent, utilities?

24    A.  No.  I mean, difficult, it's trying here and

25  there; but, no, we've always been able to pay our bills.

Angela Umeorah

Page 93

1  Q. Except for the taxes?

2  **A. Except for the taxes.**

3  Q. At some point did you realize there were money

4  problems?

5  **A. You mean while I was still here?**

6  Q. Uh-huh.

7  **A. I was thinking it wasn't -- you know, it was**

8  **beginning to show its face, but it was being managed and**

9  **paid. You know, it was beginning to raise its head that**

10 **it was hidden that way, but we were managing to pay. It**

11 **was becoming challenging.**

12 Q. You testified that in the beginning the -- the

13 four directors put money into the company. Did you ever

14 put money in after that?

15 **A. You mean like into the business?**

16 Q. Yes.

17 **A. I can't remember. But there have been**

18 **instances -- yeah, there have been instances we've had**

19 **to put in personal money. I don't know the amount now**

20 **or the particular time, but there have been instances**

21 **that we had to get money from somewhere to meet**

22 **obligations, yes.**

23 Q. And get money from?

24 **A. Other things we were doing. I mean, because**

25 **like we still owned other things.**

Page 94

1  Q. Oh, owned other?

2  **A. Yeah.**

3  Q. What else did you own?

4  **A. Myself and my husband, we owned our food store**

5  **and it was doing well, you know. Chris was working, you**

6  **know. So --**

7  Q. So there was other income from other avenues?

8  **A. Uh-huh.**

9  Q. Did you-all have corporate meetings?

10 **A. While -- before I left? While we were --**

11 Q. That you know of.

12 **A. I mean, we would meet and talk about things,**

13 **yes.**

14 Q. Did anyone take minutes?

15 **A. I don't believe it was that formalized.**

16 Q. Did you ever have meetings over the telephone

17 when you were in Nigeria about the business?

18 **A. When I left -- already, I wasn't even part of**

19 **business before I left. I wasn't -- two to three years**

20 **before I left, I was not part of the decision-making or**

21 **anything going on in Jubilee. From that time I left up**

22 **until I became a signature into this account, I was not**

23 **a part of this business in any way, shape, manner or**

24 **form, meetings or knowing what was going on, nothing.**

25 Q. I don't know if I asked you this before, but

Page 95

1  when did you first become aware of the tax problems?

2  **A. When I came back and an IRS person put**

3  **something on my door.**

4  Q. Okay. So that would be about in 2014, '15?

5  **A. Maybe '14, '15. Maybe that's it. I'm not sure**

6  **now.**

7  Q. Or 2013?

8  **A. But they contacted me and came to my door. I**

9  **was just -- came to my door and asked me -- they put a**

10 **note in front of our house and told me where to report.**

11 Q. So it was at your house on Old Windsor?

12 **A. Yes.**

13 Q. There was a note saying "Call us"?

14 **A. Call the IRS and come, yeah. You know, I'm not**

15 **sure exactly that first time.**

16 Q. Would it have been before you left?

17 **A. Oh, no. No. Before I left, it wasn't like**

18 **that at all. Before I left, payments were being made.**

19 **It wasn't -- it wasn't an issue the way it is or the way**

20 **it became.**

21 Q. Okay. Now, in regards to when you left --

22 **A. Yes.**

23 Q. -- what -- are the only documents that you have

24 that support when you left the country your passport

25 information?

Page 96

1  **A. I don't know. I mean, one can always look --**

2  **like my son registered in school, you know, would that**

3  **be a supporting document, that my son became a pupil in**

4  **a school in Nigeria. He was only 4 years old. I mean,**

5  **that's the one we supplied, that our passport showed we**

6  **left, but there are other things that would show that we**

7  **left. Like once I got there, I enrolled my child in**

8  **school. You know, I was living somewhere. I had a**

9  **lease where I lived. You know, we leased a place. We**

10 **had a lease. We had to lease where we lived.**

11 **I mean, we didn't bring all of those, but**

12 **those could be also evidence that I had a lease there, a**

13 **lease there. And my passport mostly, you know. And my**

14 **son was in school or just starting school. I don't**

15 **know. There are other things, depending on what**

16 **evidence could be brought, the fact that I left. So if**

17 **there are other things that could be -- help, they can**

18 **be brought. They are there.**

19 Q. Okay. Well, I might like to see some of the

20 this corroborating evidence --

21 **A. Yes. Like if I wrote America International**

22 **School and say "When did my son register there," they**

23 **will bring it. I could contact that company that leased**

24 **us that apartment -- not apartment, you know, the duplex**

25 **where we lived, they could bring that lease, that**

Page 105

1    Q. So you're not contract? This is --
2    **A. It's contract.**
3    Q. Okay.
4    **A. And I worked for the prison, Corizon Health.**
5    Q. Horizon?
6    **A. Corizon, C-O-R-I-Z-O-N, I worked for them as**
7    **well, Corizon Health.**
8    Q. Presently?
9    **A. Uh-huh. Oh, yeah. Off and on.**
10   Q. Had you ever been involved with any other
11   company that's had problems making their payroll taxes?
12   **A. No. Well, let me take it back a little bit**
13   **because by -- when I -- before I left, right, when I --**
14   **I left in 2004. Between 2000 and 2003, I had another**
15   **company. I opened a home health agency.**
16   Q. Okay.
17   **A. It was called City Home Health.**
18   Q. CT?
19   **A. C-I-T-Y.**
20   Q. Oh, City?
21   **A. Yeah. And for them, while I was here running**
22   **it, I paid my taxes when due to two weeks. Then I left.**
23   **Then I left it for somebody as well to manage, and I**
24   **believe he ran into problems. But I think he resolved**
25   **those issues.**

Page 106

1    Q. Who did you leave --
2    **A. Kevin Joseph. But I wasn't -- I wasn't really**
3    **working for him. I wasn't working at City at the time I**
4    **had left.**
5    Q. Okay. So City Health was your business?
6    **A. I started it, yes. And I kind of relinquished**
7    **it to somebody else.**
8    Q. Okay. And while you were working at City
9    Health from 2000 to 2003, were you in charge of the
10   payroll taxes?
11   **A. And it was made. I was. And it was paid when**
12   **due.**
13   Q. Okay. So you were aware of payroll deposits
14   early on?
15   **A. My accountant was doing that, yes. I had**
16   **gotten him from Jubilee, you know, on what to do, yes.**
17   Q. Okay. Who would you say is the ultimate
18   decision-maker of Jubilee. Would it be all four of you
19   together when you were here?
20   **A. From the beginning? At the beginning, it was**
21   **all four of us. When -- when me and Nina pulled out, it**
22   **was Michael and Chris. When Michael left -- when**
23   **Michael went to Nigeria, it became Chris, Chris and**
24   **Nina, I guess.**
25   Q. I'm going to go through your tax returns that

Page 107

1    you provided.
2         MS. PAGE: So this is going to be
3    Exhibit 20.
4         (Exhibit 20 marked.)
5         Q. (BY MS. PAGE) Okay. Exhibit 20 is a copy, I
6    guess, of a tax return that you provided in discovery to
7    us, the Government. Who is Bolu --
8    **A. Our personal accountant, Bolu Omodele.**
9    Q. And has he -- how long has he been preparing
10   your tax returns?
11   **A. For a long time, as long as I remember.**
12   Q. Generally what do you -- how do you interact
13   with him? Do you meet with him or --
14   **A. I meet him, yes.**
15   Q. And give him information?
16   **A. Yes.**
17   Q. Okay. This first tax return, 2005, that's
18   Exhibit 20, shows on Schedule C, which is one, two,
19   three, four -- do you see after Schedule A it's
20   Schedule C? Do you see that?
21   **A. Yes.**
22   Q. It shows a Schedule C, a profit or loss from
23   business, administrative services. Do you know what
24   that is in regards to?
25   **A. We -- we had City -- at that time we had City**

Page 108

1    **Medical, and we had Angel's Food Store. So we had -- we**
2    **had businesses. Is that what --**
3    Q. Okay. Well, the next page is the City Medical
4    Services.
5    **A. Okay.**
6    Q. Is that what you referred to a minute ago?
7    **A. Yeah.**
8    Q. So this is reporting the income from City
9    Medical Services of 364 -- gross receipts of $364,722.
10   Do you see that?
11   **A. Yeah. Uh-huh.**
12   Q. And so City Medical Services, was it owned by
13   you and Michael?
14   **A. Yes.**
15   Q. And can you just go into a little bit more
16   detail again, I mean, about what this did.
17   **A. This one was different. This is a home health**
18   **service where you go see elderly people and -- you know,**
19   **people like in their homes. It's different. Not like**
20   **you keep them in a home, but you go make physical**
21   **therapy visit, operational therapy visits. It was that**
22   **kind of a home health agency, Different from Jubilee.**
23   Q. And so it had -- you had employees?
24   **A. Yes.**
25   Q. And --

Angela Umeorah

Page 109

1    **A.  Well, you know, a few employees, but mainly**
2    **people on contract, like nurses.  We had nurses.  We**
3    **had --**
4    Q.  Aides?
5    **A.  Yes.  We had CNAs.  We had PT on contract.**
6    Q.  Okay.  So was this primarily your business or
7    Michael's?
8    **A.  We always own everything together, me and**
9    **Michael.  So --**
10   Q.  All right.  And then Schedule C before that,
11   could this administrative services be money that you
12   received from Jubilee?
13   **A.  2005 Michael was here.  It could be.  I don't**
14   **know.  2005, Michael was here.**
15   Q.  Because there's receipts --
16   **A.  He could still be receiving a salary from**
17   **Jubilee at that time.  He was still part running -- part**
18   **of running Jubilee.  Him and Chris were running it in**
19   **2005.**
20   Q.  Does 60,000 a year sound about right?
21   **A.  Maybe.  I don't know.  I really don't know.**
22   Q.  Then this is 2005.  And on the next Schedule E,
23   here's these addresses again, Spring Grove, Belfast,
24   Wolfe.  Then the next page there's two more.
25   **A.  Okay.**

Page 110

1    Q.  So at this time, apparently, you owned these --
2    **A.  Yes.**
3    Q.  -- five properties?
4    **A.  Yes.**
5    Q.  And receiving rent?
6    **A.  We didn't ever receive rent in any one of them.**
7    **You know, whatever money was paid, we didn't receive any**
8    **personal money from them.  Whatever money was paid was**
9    **put into account and used it to pay the mortgage.**
10   Q.  Okay.
11   **A.  Like that's how it was done.**
12   Q.  Okay.  So this is a tax return that -- it's a
13   copy.  It's not signed.  But would have you signed this
14   and filed it?
15   **A.  Yeah.**
16   Q.  Okay.
17   **A.  I believe.**
18   Q.  Okay.  So that's all for that.
19        MS. PAGE:  Mark 21.
20        (Exhibit 21 marked.)
21   Q.  (BY MS. PAGE)  Angela, you've just been given a
22   document, Government Exhibit 21.  Do you recognize this
23   document?
24   **A.  This is a tax return, yeah.**
25   Q.  So this return was prepared for you and your

Page 111

1    husband from Mr. Omodele?
2    **A.  Uh-huh.  Yes.**
3    Q.  And this is your copy.  Would you have signed
4    this --
5    **A.  Yes.**
6    Q.  -- and filed it?
7    **A.  Yes.**
8    Q.  Look at the Schedule Cs.  It looks like you
9    still have the same administrative services and the
10   City.  There's also -- if you look on the front page of
11   the return, the 1040, there's wages of 12,000.  Do you
12   know what that would have been regarding?
13   **A.  Where is it?**
14   Q.  On the income reported.  It's Page 3.
15   **A.  Oh, okay.  I'm not sure.**
16   Q.  2006.
17   **A.  Yeah.  I mean, we had Angel's at that time.**
18   **Michael was here.  So I'm not sure.  It may be from**
19   **Angel's Foods.**
20   Q.  Oh, Angel's Foods?
21   **A.  Yeah.  We had a food business.**
22   Q.  Right.
23   **A.  We had --**
24   Q.  What -- was it a corporation, or was it --
25   **A.  Uh-uh.  It was just a food store.  It was an**

Page 112

1    **indigenous food store, like an African food store.**
2    Q.  Okay.  So you're not sure what that is?
3    **A.  I mean, where that one came from, whether it**
4    **was from -- Michael was here at that time.  I'm not**
5    **sure.**
6    Q.  So how would you sign these if you weren't in
7    the country?  Did you sign them?
8    **A.  I don't know.**
9    Q.  Let's get this next one marked, the 2007
10   return.
11        (Exhibit 22 marked.)
12   Q.  (BY MS. PAGE)  Okay.  This is your --
13   Exhibit 22, do you recognize this, 2007?  On the second
14   page, is that your signature on DOJ 001200?
15   **A.  Yes.**
16   Q.  Okay.  And I'll ask Michael about these
17   administrative services since you're not sure what that
18   was.
19   **A.  Okay.**
20   Q.  It says a business address of the
21   administrative services, which is DOJ 001202.
22   **A.  O-S-A-G-E?  Where, where is the address at?**
23   Q.  1202.  Administrative services --
24   **A.  This one?  That's our home address.**
25   Q.  Yeah.

Angela Umeorah

Page 117

1    A.  By that time, this must be like my ending, like
2  maybe I have started coming back.
3    Q.  Okay.
4    A.  I started coming back and working as a nurse.
5    Q.  Were you making income in Nigeria at the time?
6    A.  I mean, it was mainly a family business, but --
7  you know, our bills were paid, but I wouldn't say we
8  were making income.
9    Q.  Does Nigeria have income tax returns?
10   A.  I believe.  Every country has income tax
11  returns, I believe.  I believe they do.
12   Q.  Okay.  Were you -- so you were working.  Okay.
13       (Exhibit 25 marked.)
14   Q.  (BY MS. PAGE) Okay, Angela.  Exhibit 25, is
15  this another return prepared by Mr. Omodele?
16   A.  Yes.
17   Q.  And this is just your copy that he gives you;
18  is that right?
19   A.  Yes.
20   Q.  After he does your taxes, he gives you a copy?
21   A.  Yes.
22   Q.  Do you file it yourself, or does he file it?
23   A.  He file it.  Like when I was there, he would
24  send them.  He will send them.  We'll sign them.  We'll
25  send it back.  It all depends.  My husband handles that.

Page 118

1  So he would be the best person to ask.
2    Q.  So your husband handles the finances in the
3  marriage?
4    A.  Yeah, in terms of he's the one that meets Bolu
5  and does all this.  I mean, he just gets my 1099 or
6  whatever it is I have and pass it on.
7    Q.  All right.  And on Page -- okay, 1, 2, 3, 4, 5,
8  6 -- 6 is a Schedule C, Page 6, it should be a
9  Schedule C for you; is that right?
10   A.  Yes.
11   Q.  Do you know what this is?  Is this reporting
12  income regarding your nursing services?
13   A.  All of them, yeah.  Either from the agency or
14  from Riverside Hospital.  Yeah.  What year was this?
15       MR. WILLIAMS:  This was '10.
16   A.  Yeah.  Yeah.
17       MS. PAGE:  Okay.  26.  We're getting near
18  the end of the returns.
19       (Exhibit 26 marked.)
20   Q.  (BY MS. PAGE) Okay.  Angela, if you can look at
21  Exhibit 26 and tell me what this is.
22   A.  This is the nursing services; right?  Is it the
23  one that you're asking me, this one?
24   Q.  Is that your name and signature?
25   A.  Oh, yeah, it is.  It is.

Page 119

1    Q.  And this is your tax return for 2011?
2    A.  Yes, it is.
3    Q.  And then you have a nursing services again in
4  2011 that you came back for?
5    A.  Yeah.
6    Q.  When you came back, did you -- did you ever
7  work for Jubilee or check in with Jubilee at all?
8    A.  No, never.  I knew nothing about Jubilee.  I
9  did not talk to them even, so...
10   Q.  It looks like this one was filed, if you look
11  at the last page by E-File?
12   A.  By who?
13   Q.  It was E-Filed.  Are you familiar with that?
14   A.  Uh-uh.  I don't know what the E-Filed means.
15       MR. WILLIAMS:  It's online.
16   Q.  (BY MS. PAGE) Online.
17   A.  My husband would probably know.
18   Q.  Yeah, that's -- I think that's his signature
19  down there.  Okay.
20       (Exhibit 27 marked.)
21   Q.  (BY MS. PAGE) Could you identify this
22  Exhibit 27?
23   A.  Yeah.  Our 2012 income tax report.
24   Q.  And did you receive any income this year?
25   A.  2012?

Page 120

1    Q.  Uh-huh.
2    A.  Uh-huh.  Yeah, from Houston.
3    Q.  From nursing?
4    A.  Yeah.  By this time, yeah, I started even
5  working more, yeah.  This time it would be agency.  I
6  believe this one I started also working for
7  Texas Specialty.
8    Q.  And at this time was your husband in the
9  United States --
10   A.  No.
11   Q.  -- 2012?
12   A.  No.  He was in Nigeria.  He didn't come back
13  until two years after we came back.
14   Q.  Okay.  So you came back --
15   A.  With my son.
16   Q.  Right.
17       (Exhibit 28 marked.)
18   Q.  (BY MS. PAGE) Could you identify Exhibit 28,
19  please?
20   A.  Yes.  Our 2013 income tax return.
21   Q.  Now, on this return, if you look on the first
22  page of the return, there's wages of 131,000 in 2013.
23  Do you -- would you know what that is?
24   A.  My income.
25   Q.  That's your income?

Page 125

1  thing.

2       (Exhibit 32 marked.)

3       MS. PAGE:  I'm going to also get this

4  marked at this time.  33, please.

5       (Exhibit 33 marked.)

6  Q.  (BY MS. PAGE) Okay.  So if you'll look at 33

7  first.  And you said that you reviewed some of your

8  discovery before?

9  **A.  Yeah, I looked at it.  This morning, I looked**

10 **at it.**

11      MS. PAGE:  Is there one that's written on?

12      THE WITNESS:  Yes.  This one.

13      MS. PAGE:  That's mine.  Sorry about that.

14 Q.  (BY MS. PAGE) In the first request for

15 admission, you deny that you're an officer of Jubilee

16 during the periods at issue.  But weren't you an officer

17 the whole time?

18 **A.  I mean, if I removed my name.  I never**

19 **official -- like I told you, I never officially removed**

20 **my name.  I just wasn't part of that business or running**

21 **it or -- between when I was away.**

22 Q.  So do you still deny that you were an officer

23 during the periods at issue?

24 **A.  My statement is this:  I was part of that**

25 **company and was part of owning it.  I left in 2004.  And**

Page 126

1  **between 2004 and 2014, you know, when my name was put**

2  **back -- forcefully put back to be a signature of that**

3  **company, I wasn't -- actually, I wasn't part of it.  I**

4  **was -- it was kind of like I wasn't -- they didn't want**

5  **me to be part of it because I had to force my way into**

6  **it.  I didn't come back into it easily.**

7       **When we requested -- I'm talking too much.**

8  **Let me just hush.  When we requested to come into it, it**

9  **was refused.  We had to, you know, pull some strings,**

10 **write to family before.**

11 Q.  But you had an ownership interest during the

12 whole period; correct?

13 **A.  My name was there.  But I wasn't part of**

14 **running it, and I didn't know about it.  And things were**

15 **done, you know --**

16 Q.  Let me ask you a question:  On your income tax

17 liabilities that are in the complaint, do you dispute

18 that you owe those income tax liabilities?

19 **A.  Yes.**

20 Q.  You do?

21 **A.  Yes.  I dispute that I owed the period when I**

22 **was not --**

23 Q.  No.  I'm saying income tax.

24 **A.  Income?**

25 Q.  Uh-huh.  Income tax liabilities that you filed

Page 127

1  returns on and reported.

2  **A.  Oh, do I dispute that?  I -- no.**

3  Q.  Okay.  You don't dispute the income tax

4  liabilities.  It's the trust fund recovery penalties;

5  correct?

6  **A.  Yes, ma'am.**

7  Q.  Okay.

8  **A.  Sorry.  I didn't understand the question.**

9  Q.  Now, you were in the country in December 31,

10 2003; correct?

11 **A.  2000 and?**

12 Q.  '3.

13 **A.  Yes.**

14 Q.  Do you dispute that you're liable for the trust

15 fund recovery penalty for that period?

16 **A.  By that, 2013, I had --**

17 Q.  '3, '3.

18 **A.  Sorry.  2003, I wasn't part of -- you know, I**

19 **had pulled back, me and Nina had pulled back --**

20 Q.  Okay.

21 **A.  -- you know, in whatever was happening there.**

22 Q.  So even when you're in the country, you dispute

23 that you're a trust fund recovery -- that you're liable?

24 **A.  You know, and honestly -- and that was 2013,**

25 **right, I wouldn't -- because my husband was also**

Page 128

1  **representing my interest.  So I wouldn't dispute that,**

2  **you know, while I was in the country because Michael was**

3  **still part of the business.**

4  Q.  But he wasn't here?

5  **A.  In 2003, Michael was here.**

6  Q.  Oh, I thought you said '13.

7  **A.  Oh, sorry.  Which one did you say 2013 or '3?**

8  Q.  Well, I said 2003, but I thought you switched

9  to 2013.

10 **A.  Uh-uh.  I'm still talking about --**

11 Q.  2003.

12 **A.  -- 2003.**

13 Q.  So you don't dispute?

14 **A.  No.**

15 Q.  Okay.

16 **A.  No.**

17 Q.  But you dispute anything in 2004 --

18 **A.  Yes, ma'am.**

19 Q.  -- '5, '6, '7, '8?

20 **A.  So January or whenever -- 2014 whenever my**

21 **name --**

22 Q.  You came back?

23 **A.  Yes.**

24 Q.  Okay.  Who is Yaw Okore-Adjei?  Was he one of

25 Jubilee's accountants?

Page 129

1    A. I can't -- I need to see the name. Is it here?

2    Q. Oh, it's on -- I think I switched to

3  Exhibit 32. It's Number 18, Interrogatory Number 18.

4    **A. Yes. That's Jubilee's accountant at the time,**

5  **I believe.**

6    Q. He was the accountant before Dominic?

7    **A. Yes.**

8    Q. Okay. Did you ever deal with him,

9  Yaw Okore-Adjei?

10   **A. No.**

11   Q. Okay.

12   **A. But -- no.**

13   Q. All right.

14   **A. But, I mean, I know him. After I came back and**

15  **was part of the business, there was some back taxes --**

16  **something needed to be done that he only was the one.**

17  **So I believe he knows who I am. I called him and tried**

18  **to get him to prepare something that wasn't prepared in**

19  **the tax or something.**

20       MS. PAGE: That's all the questions I have.

21       MR. WILLIAMS: I have no questions at this

22  point.

23

24       * * * * * *

25

Page 130

1        CHANGES AND SIGNATURE

2  WITNESS NAME:              DATE OF DEPOSITION:

3  ANGELA UMEORAH            MARCH 15, 2018

4

5  PAGE  LINE     CHANGE        REASON

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 131

1        I, ANGELA UMEORAH, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted herein.

4        _____

5            ANGELA UMEORAH

6            JOB NO. 355167

7

8  THE STATE OF _____)

9  COUNTY OF _____)

10   Before me, _____, on this day

11 personally appeared ANGELA UMEORAH, known to me (or

12 proved to me under oath or through

13 _____) (description of identity card

14 or other document) to be the person whose name is

15 subscribed to the foregoing instrument and acknowledged

16 to me that they executed the same for the purposes and

17 consideration therein expressed.

18   Given under my hand and seal of office this _____

19 day of _____, _____.

20

21        _____

22            NOTARY PUBLIC IN AND FOR

23            THE STATE OF _____

24            MY COMMISSION EXPIRES:

25        _____

Page 132

1        IN THE UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF TEXAS

2              HOUSTON DIVISION

3  UNITED STATES OF AMERICA,  *

4      Plaintiff,       *

5  VS.              * Case No. 4:17-cv-01164

6  CHRIS C. ULASI, MICHAEL   *

7  UMEORAH, ANGELA UMEORAH   *

   NINA U. DENCHUKWU, and

8  OCWEN LOAN SERVICING, LLC  *

      Defendants.      *

9

10        REPORTER'S CERTIFICATION

11          ORAL DEPOSITION OF

            ANGELA UMEORAH

12          MARCH 15, 2018

13   I, Debbie Boothe, Certified Shorthand Reporter

14 in and for the State of Texas, hereby certify to the

15 following:

16   That the witness, ANGELA UMEORAH, was duly

17 sworn by the officer and that the transcript of the oral

18 deposition is a true record of the testimony given by

19 the witness;

20   I further certify that pursuant to FRCP Rule

21 30(f)(1) that the signature of the deponent:

22   __X__ was requested by the deponent or a party

23 before the completion of the deposition and returned

24 within 30 days from date of receipt of the transcript.

25 If returned, the attached Changes and Signature Page

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3

    UNITED STATES OF AMERICA,    *
 4                               *
          Plaintiff,             *
 5                               *
    VS.                          *  Case No. 4:17-cv-01164
 6                               *
    CHRIS C. ULASI, MICHAEL      *
 7  UMEORAH, ANGELA UMEORAH      *
    NINA U. DENCHUKWU, and       *
 8  OCWEN LOAN SERVICING, LLC    *
                                 *
 9          Defendants.          *

10
                    REPORTER'S CERTIFICATION
11                    ORAL DEPOSITION OF
                      ANGELA UMEORAH
12                    MARCH 15, 2018

13          I, Debbie Boothe, Certified Shorthand Reporter

14  in and for the State of Texas, hereby certify to the

15  following:

16          That the witness, ANGELA UMEORAH, was duly

17  sworn by the officer and that the transcript of the oral

18  deposition is a true record of the testimony given by

19  the witness;

20          I further certify that pursuant to FRCP Rule

21  30(f)(1) that the signature of the deponent:

22          __X__ was requested by the deponent or a party

23  before the completion of the deposition and returned

24  within 30 days from date of receipt of the transcript.

25  If returned, the attached Changes and Signature Page
```

1    contains any changes and the reasons therefor;

2           _____ was not requested by the deponent or a

3    party before the completion of the deposition.

4           I further certify that I am neither attorney

5    nor counsel for, related to, nor employed by any of the

6    parties to the action in which this testimony was taken.

7    Further, I am not a relative or employee of any attorney

8    of record in this cause, nor am I financially or

9    otherwise interested in the outcome of the action.

10          Subscribed and sworn to on this the 27th

11   day of March, 2018.

12

13

14          _____

       DEBBIE BOOTHE, CSR
15     Texas CSR 4708
       Expiration Date:  12-31-18
16     Lexitas
       Firm Registration No. 95
17     13101 Northwest Freeway, Suite 210
       Houston, Texas   77040
18     281-469-5580

19
     JOB NO. 355167
20

21

22

23

24

25