Chris C. Ulasi



**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF TEXAS
2        HOUSTON DIVISION

3
UNITED STATES OF AMERICA,  *
4       Plaintiff,      *
                        *
5   VS.                 * Case No. 4:17-cv-01164
6                       *
CHRIS C. ULASI, MICHAEL *
7   UMEORAH, ANGELA UMEORAH *
    NINA U. DENCHUKWU, and  *
8   OCWEN LOAN SERVICING, LLC *
9       Defendants.     *

10
11   ****************************************
12            THE ORAL
             DEPOSITION OF
13           CHRIS C. ULASI
             MARCH 16, 2018
14   ****************************************
15
16       ORAL DEPOSITION OF CHRIS C. ULASI, produced as a
17   witness at the instance of the PLAINTIFF, and duly
18   sworn, was taken in the above-styled and numbered cause
19   on the 16th of March, 2018, from 10:42 a.m. to 1:20
20   p.m., before Debbie Boothe, CSR, in and for the State of
21   Texas, reported by machine shorthand at the U.S.
22   Attorney's Office, 1000 Louisiana, Suite 2300, Houston,
23   Texas 77002, pursuant to the Federal Rules of Civil
24   Procedure and the provisions stated in the record or
25   attached hereto.

**Page 2**

1        A P P E A R A N C E S
2
FOR THE PLAINTIFF:
3
    Ms. Stephanie M. Page
4   United States Department of Justice
    Tax Division
5   717 N. Harwood Street, Suite 400
    Dallas, Texas  75201
6   (214) 880-9721   (214) 880-9774
    stephanie.m.page@usdoj.gov
7
8   FOR THE DEFENDANTS CHRIS C. ULASI AND NINA U. DENCHUKWU:
9   Mr. Floyd E. James, Sr.
    Floyd E. James, Sr. & Associates, P.C.
10  6200 Savoy, Suite 260
    Houston, Texas  77036
11  (713) 981-8600   (713) 334-3270
    floydlaw@sbcglobal.net
12
13  FOR THE DEFENDANTS MICHAEL UMEORAH AND ANGELA UMEORAH:
14  Mr. Cornel A. Williams
    Mr. Roy Whitaker
15  Cornel A. Williams & Associates
    1405 Palm Street
16  Houston, Texas  77004-5740
    (713) 520-5153   (713) 524-4528 Facsimile
17  willassoc@aol.com
    roywhitaker10@att.net
18
19       * * * * * *
20
21
22
23
24
25

Government Exhibit K

**Page 3**

1            INDEX
2
3   WITNESS:  CHRIS C. ULASI
4                          PAGE
5   Appearances                     2
6   Examination by Ms. Stephanie M. Page      8
7    10:42 a.m. - 11:56 a.m.
8   Examination by Mr. Roy Whitaker           77
9    12:58 p.m. - 1:20 p.m.
10  Changes and Signature           93
11  Reporter's Certificate          95
12
13       * * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1            EXHIBIT INDEX
2   NUMBER      DESCRIPTION           PAGE
3   Exhibit 37   Default Judgment Against
4         Chris C. Ulasi and Nina
5         U. Denchukwu              14
6   Exhibit 38   Subpoena to Testify
7         Chris C. Ulasi            15
8   Exhibit 39   United States Bankruptcy Court
9         Souther District of Texas
10        Houston Division Final Decree
11        In Re:  Jubilee Group Homes, Inc.   23
12  Exhibit 40   Jubilee Group Homes, Inc.
13        Meeting of Board of Directors
14        Held on Monday, February 2, 1998    25
15  Exhibit 41   Letter to Jubilee Group Homes,
16        Inc. From Wells Fargo Legal Order
17        Processing 1/15/14        66
18  Exhibit 42   Jubilee Group Homes, Inc.
19        Consumer Roster           68
20  Exhibit 43   EFTPS Enrollment for Jubilee
21        Group Homes, Inc.         68
22  Exhibit 44   Report of Interview With Individual
23        Relative to Trust Fund Recovery
24        Penalty or Personal Liability for
25        Excise Taxes, Chris C. Ulasi      68

Chris C. Ulasi

**Page 33**

1 attend, you know, government-sponsored fair.  This is
2 where you visit guardians or parents of clients with,
3 you know, disabilities.  And they will go through your
4 brochure, talk to your staff and everything, and they
5 decide to make up your mind if they want to come to your
6 facility.  If they do, they will sign up and they will
7 go through the procedure and they will be assigned to
8 your group home.  That's the procedure.
9     Q.  Now you can look at the document in front of
10 you that's been labeled Exhibit 40.
11     A.  Yes.
12     Q.  What is this document?
13     A.  It's just a document that we sent to DADS to
14 inform them that the company has been incorporated.
15     Q.  So this is in 1998, and the four directors were
16 appointed or determined at that time; is that correct?
17     A.  Correct.
18     Q.  And the four directors are also partial owners?
19     A.  Yes.
20     Q.  Equal owners?
21     A.  Equal owners.
22     Q.  And has that been the same -- has there been
23 any changes to the directors or ownership during the
24 term of the company?
25     A.  Up until, I think, 2015 or so, and I think that

**Page 34**

1 was when the directors decided that Michael and Chris,
2 myself, should take more responsibilities to managing
3 the company, and the shares were split into 50/50.  I
4 think that document is also included in there.
5     Q.  Okay.
6     A.  It's a document that we sent to DADS.  Under
7 the license renewal requirements, you have to restate
8 the ownership and the structure of the organization.
9     Q.  So the shares have been 25 percent each up
10 until sometime in 2015?
11     A.  Yes.
12     Q.  And you and Michael were transferred.  Did you
13 give anything in exchange for the shares, or how were
14 they transferred to you?
15     A.  It was our arrangement.  It was just -- it was
16 agreed that that's what it was going to be, and that's
17 how it was entered into the ownership document for the
18 Department of Aging and Disability.
19     Q.  In the beginning of the business, you had an
20 operation in Corpus, in Houston, and then The Valley and
21 Beaumont; is that correct?
22     A.  Correct.
23     Q.  And then Corpus -- well, the only operation you
24 have left is in Beaumont; is that correct?
25     A.  Yes.

**Page 35**

1     Q.  What happened to the other three operations?
2     A.  The -- the operation in Corpus Christi, it's in
3 a contiguous county with Nueces.  So the both of them
4 were kind of tied together, the operation in McAllen and
5 Corpus Christi.  So when the license of Corpus Christi
6 was jeopardized, it affected everything in McAllen.
7 So but what happened was that we do have an annual
8 survey that is conducted by DADS just to review the
9 entire program to see progress and to see areas that
10 needs to be improved or see where things are going
11 wrong.
12        So they came, and apparently there was one
13 of our managers who was in charge of a trust fund for
14 the clients, not trust fund for, you know, the wages,
15 not that one, for the employees.  This is for the
16 clients that we take care of.  Because they do get
17 Social Security or some other kind of, you know, small
18 payments that will enable them to live a normal life.
19 And one of those employees was tampering with it and it
20 was found out and there was a major issue, and that's
21 how we lost the license.
22     Q.  And when was that?
23     A.  That was, I think, in 2006.  And I think I
24 included that document in there, officially what we
25 wrote to DADS telling them that that relied to the

**Page 36**

1 license.
2     Q.  So that -- the certification was lost --
3     A.  Yes.
4     Q.  -- in the Corpus --
5     A.  Yes.
6     Q.  -- and the other offices?
7     A.  Yes.
8     Q.  When you originally set up the company, did you
9 contribute anything monetarily-wise to Jubilee?
10     A.  If -- we contributed, you know, in various
11 ways.  We contributed in terms of time.  We contributed
12 in terms of skill sets, you know.  We wanted to do a
13 company that would serve the community, would serve the
14 clients, you know, in line with the policies of that.
15 And so we -- whatever is possible on the part of all the
16 directors, whatever talent they have, they brought in.
17 And we did make periodic expenses that came from all of
18 us.  So I cannot recall all of that, Michael or myself
19 or Angela or Nina actually gave us such an amount of
20 money.
21     Q.  But you would say that the directors at
22 different times contributed or paid expenses?
23     A.  (Witness nodding head.)
24     Q.  Did any of the directors or owners get a salary
25 during the period Jubilee --

Page 37

1    A. Yeah.  I think there was time it was, you know,
2  spotted.
3    Q. It was what?
4    A. It was spotted.  It wasn't like a regular thing
5  because the company was still being built.  So for quite
6  a while we didn't get any salaries.
7    Q. Who determined when someone would get a salary?
8    A. The four of us.
9    Q. So eventually the company filed bankruptcy in
10  May of 2007; is that right?
11    A. Correct.
12    Q. Why did the -- who determined the company
13  should file bankruptcy?
14    A. When the IRS lady came and she said that we
15  don't have any alternative, that we pay entire what we
16  owe, we can take the option of bankruptcy to help us to
17  reorganize.  I promptly notified the Umeorahs and
18  conferenced with them, and we all agreed that that was
19  the pathway to go.  After that, then I sought the help
20  of counsel, and that's when I -- we contracted Mr. James
21  to help us along those lines.
22    Q. So the bankruptcy was filed May 21, 2007.  When
23  did the IRS contact -- when did you have the
24  conversation with this lady?
25    A. This was like a few days after that -- before

Page 38

1  that, because she had actually come to the office and
2  was ready to shut it down.
3    Q. Who was at the office when she visited?
4    A. Our employees were there, but they called me
5  and I came and met with her.
6    Q. So she went to the Beaumont office?
7    A. No.  It was at Houston.  Houston was still open
8  at that time.
9    Q. And then you said that you conferenced with the
10  Umeorahs.
11    A. Yes.
12    Q. What do you mean you conferenced with them?
13    A. It was a major decision about it, you know, the
14  survival of the company.  And the reason for that, of
15  course, all of us are very much aware it was the tax
16  problems we were having and cash flow.  And so I called
17  them and "I said we had a visit from" -- I think -- I
18  can't remember her name -- "the IRS representative.  And
19  she said 'Look, either we come up with initially'" -- I
20  can't remember the amount, but something around 200,000
21  or so.  But if we don't have it, that she will advise
22  that we shut the -- file the bankruptcy to help us to
23  reorganize.
24    Q. Were the Umeorahs in Houston at the time of
25  the --

Page 39

1    A. No.  They were overseas.
2    Q. In Nigeria?
3    A. Yes.
4    Q. But they agreed with you to put the company in
5  bankruptcy?
6    A. Yes.
7    Q. In -- when you filed for bankruptcy, was
8  Mr. Umeorah the president and chief executor prior to
9  the bankruptcy, executive officer?
10    A. I think so.  And I was the vice president.
11    Q. When did Mr. Umeorah go to Nigeria?
12    A. I don't remember the exact date, but he was in
13  and out.  I can't tell you exactly the day I would say
14  that they actually moved all their belonging and just
15  relocated, but I know that he was in -- he would come in
16  with the state in the homestead here.  So they were in
17  and out.
18    Q. Did -- okay.  What do you recall of their time
19  in Nigeria or their time in the United States, both of
20  them, Angela Umeorah and Dr. Umeorah?
21    A. I'm sorry.  I don't understand what you mean.
22    Q. When were they Nigeria, approximately?
23    A. Maybe about six years.
24    Q. Were they both over there?
25    A. Yeah, they were both over there.  They were

Page 40

1  visiting here, too.
2    Q. And when they visited here, did they --
3    A. We did see them.  We did conference.  We did
4  talk.
5    Q. And during that time, were they aware what was
6  happening at Jubilee?
7    A. Very much so.
8    Q. And how were they aware?
9    A. During our conversation, there was no mention
10  of decision about Jubilee that was taken independent of
11  the directors.  The decision for bankruptcy was they
12  were truly informed, and if they did not okay it, I
13  wasn't going to contact Mr. James.  If it was in the
14  best interest of the company then, we always agreed to
15  never lose -- you know, find our footing or find a means
16  of keeping the company afloat because we have employees.
17  And most importantly, we have people with intellectual
18  challenges that we needed to take care of them.  And
19  that's why they all agreed.
20    Q. Okay.  During the period at issue here, this is
21  the time that is in this lawsuit the trust fund recovery
22  penalties were accrued, December 2003 through March
23  2015.  Okay.  So that's the period we're talking about.
24    A. Sure.
25    Q. What were your duties during that time period?

## Page 41

1    A.  We alternated doing different things to fuel
2  the company to help it.  So over that times I did case
3  management.  I also did most of the billing through
4  electronic submission of services that were rendered for
5  reimbursement.
6         Michael did billing sometimes that I'm not
7  available to do it, and he did it.  That's -- and I
8  did -- honestly, I ran around.  I did quite a bit of
9  whatever it takes to keep the company afloat.
10   Q.  Who would you say managed the day-to-day
11  business?
12   A.  It was not one person that managed the
13  day-to-day business.  And the reason for that is that in
14  The Valley and in Corpus Christi we had very competent,
15  you know, case supervisors, managers.  So what we
16  normally do was we would visit there almost on a weekly
17  basis and interact with the staff and see what's going
18  on and drive back to Houston.
19   Q.  What was each of the directors' skill sets or
20  expertise?
21   A.  I'll start with mine.  I've already given you
22  my background.  And Nina was a former bank manager, and
23  she also have a degree in nursing.  Dr. Angela Umeorah
24  has a Ph.D. in some field in -- I don't remember
25  specifically what field, but she also has a degree in

## Page 42

1  nursing.
2         Michael, my high school classmate, we went
3  to school together, a long-time friend, has a Ph.D. in
4  geophysics.
5   Q.  How much time did the four directors devote to
6  Jubilee during the -- this period at issue?
7   A.  Quite a lot of time.
8   Q.  Would you say 40 hours a week for each?
9   A.  Sometimes more because the work continued after
10  normal working period.  Sometimes we meet quite late in
11  the evening.  We met on weekends.
12   Q.  During the period at issue -- now, we're still
13  talking about 2003 to March 2015, the eleven-year span.
14  Who handled payroll?
15   A.  Okay.  When we started, we -- we used
16  QuickBooks to do the payroll.  I did payroll, and
17  Michael did payroll.
18   Q.  And do you know how -- when you stopped using
19  QuickBooks?
20   A.  I think we stopped using QuickBooks when we
21  switched to -- to Wells Fargo payroll services.
22   Q.  And that was in the time of the bankruptcy?
23   A.  Yeah.
24   Q.  So when you say that you and Michael did
25  payroll, does that mean that you-all computed what the

## Page 43

1  payroll taxes were --
2   A.  Yeah.
3   Q.  -- cut the checks?  How did this work?
4   A.  When they submit their timesheets, you know, we
5  go over the timesheets.  Then, of course, I was the one
6  entering.  If I'm not there, he enters the document --
7  enters the timesheet in the system so we can print the
8  checks.
9   Q.  And then what about -- the QuickBooks tells you
10  what tax is to be deposited?
11   A.  Yeah.  And we printed it out, too, for payment,
12  you know, to file, then eventually make the payment.
13   Q.  And there were a number of times that you did
14  not deposit the payroll --
15   A.  Definitely.
16   Q.  -- taxes?
17         And who was aware of that?
18   A.  The four of us were aware.
19   Q.  How were -- obviously the person that was not
20  depositing the checks was aware, which would be you or
21  Michael; correct?
22   A.  Well, he -- that's the point I'm making.  This
23  company was a joint company.  But to answer your
24  question specifically, they were aware of taxes that
25  were paid and those that were outstanding, yeah.

## Page 44

1   Q.  But Jubilee had payroll tax deposit problems
2  prior to 2003; is that correct?
3   A.  2003?
4   Q.  2003.
5   A.  I don't remember.
6   Q.  I can show you the proof of claim in the
7  bankruptcy.  Do you recall there being a proof of claim
8  filed by the IRS, the claim of what all the taxes --
9   A.  Oh, yeah, I remember.
10   Q.  Let me show you that to refresh your memory.
11         (Previously marked Exhibit 35.)
12   Q.  (BY MS. PAGE)  So it's Exhibit 35, and I'll
13  just show you this.  Okay.  That -- Exhibit 35 is a --
14   A.  Sure.
15   Q.  -- is the proof of claim that was filed in the
16  bankruptcy.
17   A.  Yeah.
18   Q.  If you turn the page, it will show you --
19   A.  The details.
20   Q.  Uh-huh.  So it appears that Jubilee was having
21  problems --
22   A.  Yeah.
23   Q.  -- before 2003 because -- so you agree?
24   A.  Yeah, 2000 -- yeah, there was some outstanding,
25  you know --

Chris C. Ulasi

Page 45

1    Q.  Tax?

2    A.  -- taxes.

3    Q.  Tax problem, the tax deposits from payroll.

4         And when all four of the directors were aware

5    during the time that they were being accrued?

6    A.  Correct.

7    Q.  Because you had meetings about them?

8    A.  We had -- we met on a weekly basis and

9    sometimes on a daily basis to discuss the events of the

10   company and what's going on.

11   Q.  What about when Michael and Angela were not in

12   the country?

13   A.  Are you speak -- specifically what you are

14   referring to?

15   Q.  Oh, I thought that you said that they were in

16   Nigeria for six years or so.

17   A.  But I was responding to a specific time period

18   that you asked me a question regarding when they were

19   away, when they left the country to come back --

20   Q.  Yes.

21   A.  -- and I say yes, six years.  But from the

22   founding of the company, up until that time, the four of

23   us made decisions regarding Jubilee.  We had daily,

24   sometimes weekly meetings to discuss the affairs of the

25   company, for what strategies, everything.

Page 46

1    Q.  Okay.  What about when they were not in

2    Houston?

3    A.  When they were not in Houston, when they moved

4    back to Nigeria for that period of time, I was doing the

5    payroll until I self-contracted it to -- to Wells Fargo,

6    then eventually to the current accountant.

7    Q.  And during that time the company was falling

8    behind on the payroll taxes; is that right?

9    A.  Yes.

10   Q.  And you were aware of that?

11   A.  I was aware of that, and they were aware of

12   that, too.

13   Q.  And they were aware because?

14   A.  Because I was informing them what was going on.

15   They knew we were going through bankruptcy, and they

16   knew we were having to pay huge sums of money to the

17   government on the bankruptcy thing.  I was responsible

18   for doing the payroll because nobody else -- they were

19   not here.  But everything regarding the company, I let

20   them know what's going on.

21   Q.  Now, after the bankruptcy and Wells Fargo was

22   handling -- did you say they were handling the payroll?

23   A.  Yeah, they did the payroll for us for quite

24   some time.

25   Q.  And how did that work?

Page 47

1    A.  We -- the timesheets I sent to them

2    electronically, and they would prepare payroll and make

3    our deposits.  So they were making deposits until when

4    they -- they stop making deposit apparently because

5    unlike you making it on yourself as the owner of the

6    company, they make it as when due.  And if funds are not

7    in the account, they don't make it.  So that's what --

8    after a while, you know, they stopped.

9    Q.  So you're saying that they did not -- they made

10   the deposits or they paid the tax deposits that were

11   computed.  They computed them and they made them.  If

12   there wasn't any money in the account, they would not

13   make them?

14   A.  (Witness nodding head.)

15   Q.  Did they ever contact you or one of the

16   directors and let you know that they needed more money

17   for the deposits?

18   A.  Yes.

19   Q.  And what did you-all do?

20   A.  Well, if we had money, we could -- I will have

21   to -- money -- if we had to source the money, we could

22   source the money.  The way the home health community

23   service is base is through reimbursement.  Sometimes if

24   they don't get all the information, you don't get

25   reimbursed.  So sometimes it would take weeks and

Page 48

1    sometimes months that you get reimbursed.  And we had a

2    huge payroll at that time, and so we fell behind.  We

3    fell behind.  Honestly, that's what happened.  We fell

4    behind.  And we tried to make sure that the clients are

5    taken care of, which was primary.  Also, you know, do

6    what we can in terms of making sure that they were all

7    taken care of.

8    Q.  And how did the paychecks get to the actual

9    employees?

10   A.  They were overnighted to them.  We used Lone

11   Star for a period, and I think they still use Lone

12   Star now.

13   Q.  Overnighted from Houston?

14   A.  From the accountant's office.  And when Wells

15   Fargo was doing it, they were doing it by FedEx.

16   Q.  So Wells Fargo did it up to a certain point --

17   A.  Right.

18   Q.  -- and then what made you change from Wells

19   Fargo to the accountant; is that correct?

20   A.  Yes.  Because we wanted, you know, this

21   accountant who has a reputation doing both payroll,

22   doing the cost report that is required by that, that he

23   will be in a better position to manage.  And he's been

24   doing a great job since then.

25   Q.  Okay.  And what's the name of the accountant?

Page 49

1      A.  Mr. Dominic Amaugwu.

2      Q.  Was there another accountant named Yaw?

3      A.  Yeah, that's the one we started with.

4  Actually, the accountant we started with was

5  Mr. Apenten, CPA, and he passed on.  And this Mr. Yaw

6  worked in that company but opened his own office, and we

7  continued with him.

8      Q.  And these accountants were used by Jubilee

9  after you stopped working with Wells Fargo?

10     A.  No, no, no.  That's way before, way before

11 Wells Fargo.

12     Q.  Okay.  So it was Mr. -- I'm not sure.

13     A.  Mr. Apenten and later on Mr. Yaw were our

14 initial, you know, accountants that worked for Jubilee

15 up until -- up until when Wells Fargo have that contract

16 that's in your exhibit, too.  Once Wells Fargo took

17 over, then have the contract with Mr. Dominic Apenten,

18 CPA -- Dominic Amaugwu, CPA, also, when he took over

19 from doing the Wells Fargo.

20     Q.  Okay.  In regard to the accountants, who found

21 these accountants, and who hired the accountants in

22 Jubilee?

23     A.  If I recall, Mr. Apenten was quite a name in

24 the community at that time that was doing, you know,

25 accounting for many friends.  I think we were referred

Page 50

1  to him.  It was a referral.  But in the case of

2  Mr. Amaugwu, also, you know, have experience doing

3  Medicaid-related accounting.  I also asked around and

4  found him myself.  That was Michael and Angela were

5  still overseas at that time.

6      Q.  So were you able to hire Mr. Dominic without

7  any of the other directors' input?

8      A.  No.  I told them that the -- we needed somebody

9  to do our cost report because it was central to doing

10 business with DADS and that I have found somebody who is

11 very competent who can do the payroll and also do the

12 accounting.  And he has good references from other

13 business people, and that's what happened.

14     Q.  So the Umeorahs were aware that you were

15 changing to this accountant?

16     A.  They were aware.

17     Q.  Although they were in Nigeria?

18     A.  Yeah.

19     Q.  And you are aware of the duty to deposit

20 payroll taxes; correct?

21     A.  Yes.

22     Q.  How did you come to know about the payroll tax,

23 the duty to deposit them?

24     A.  You mean our obligation --

25     Q.  Yes.

Page 51

1      A.  -- to deposit?

2          We've always known all along.

3      Q.  Identify individuals who prepared, reviewed,

4  signed or transmitted the Form 941 tax returns for

5  Jubilee.

6      A.  From the inception?

7      Q.  During the period at issue, which is December

8  2003 to March 2015.

9      A.  Because I do the payroll most of the time, I do

10 print out the 941, the schedule and everything.  And

11 just I will look at it next to the IRS office on

12 Gessner.  I just walked over, and I would deposit it.

13 Sometimes Michael did.

14     Q.  Is that also the same for the Form 941s?

15     A.  Yeah, that's what I'm saying, 941s, yeah.

16     Q.  Okay.  So Michael and you mainly did that?

17     A.  Most of the time, yeah.

18     Q.  Could Angela and Nina have -- did they have the

19 authority to sign them?

20     A.  Oh, yeah.  All of us had the authority to sign

21 it.  Four-way signatures on the bank accounts and

22 everything.

23     Q.  And did everyone have the authority to make tax

24 deposits?

25     A.  Yes.

Page 52

1      Q.  Could anyone have gone in and gotten a check

2  and written -- signed the check and paid the tax

3  deposit?

4      A.  I don't understand.

5      Q.  Did everyone have the ability in regards to

6  your checking account -- not everyone -- but the four

7  directors to make a tax deposit -- to sign a check for

8  taxes?

9      A.  Yeah, they had authority.  They had authority

10 to sign checks for the company, and that includes making

11 deposits were myself, Michael, or any of us that's

12 available.  Whoever that is available, they would do it.

13 But most of the time Michael and myself did.

14     Q.  Identify the individuals authorized to hire or

15 fire employees of Jubilee during the period at issue.

16     A.  Okay.  Depending.  The -- during that period,

17 for instance, Ms. Debbie Hovda, who was our service

18 coordinator in Corpus Christi, a very experienced lady

19 who worked for the local authority had -- they hire.

20 They just hire the right people because they're

21 managers.  They're managing the company in

22 Corpus Christi.  So they made the hire and told us, you

23 know, what they have done.

24     Q.  Did Mr. and Mrs. Umeorah hire -- were they

25 authorized to hire and fire employees?

Chris C. Ulasi

24 (93 - 96)

## Page 93

```
 1       CHANGES AND SIGNATURE
 2  WITNESS NAME:          DATE OF DEPOSITION:
 3  CHRIS C. ULASI         MARCH 16, 2018
 4
 5  PAGE LINE    CHANGE      REASON
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

## Page 94

```
 1      I, CHRIS C. ULASI, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted herein.
 4          _____
 5          CHRIS C. ULASI
 6          JOB NO. 355172
 7
 8  THE STATE OF _____)
 9  COUNTY OF    _____)
10     Before me, _____, on this day
11  personally appeared CHRIS C. ULASI, known to me (or
12  proved to me under oath or through
13  _____) (description of identity card
14  or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18     Given under my hand and seal of office this _____
19  day of _____, _____.
20
21          _____
22          NOTARY PUBLIC IN AND FOR
23          THE STATE OF _____
24          MY COMMISSION EXPIRES:
25          _____
```

## Page 95

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2              HOUSTON DIVISION
 3
 4  UNITED STATES OF AMERICA,  *
       Plaintiff,       *
 5  VS.                  *  Case No. 4:17-cv-01164
 6                       *
    CHRIS C. ULASI, MICHAEL   *
 7  UMEORAH, ANGELA UMEORAH   *
    NINA U. DENCHUKWU, and
 8  OCWEN LOAN SERVICING, LLC *
 9     Defendants.       *
10          REPORTER'S CERTIFICATION
             ORAL DEPOSITION OF
11             CHRIS C. ULASI
             MARCH 16, 2018
12
13     I, Debbie Boothe, Certified Shorthand Reporter
14  in and for the State of Texas, hereby certify to the
15  following:
16     That the witness, CHRIS C. ULASI, was duly
17  sworn by the officer and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20     I further certify that pursuant to FRCP Rule
21  30(f)(1) that the signature of the deponent:
22  __X___ was requested by the deponent or a party
23  before the completion of the deposition and returned
24  within 30 days from date of receipt of the transcript.
25  If returned, the attached Changes and Signature Page
```

## Page 96

```
 1  contains any changes and the reasons therefor;
 2     _____ was not requested by the deponent or a
 3  party before the completion of the deposition.
 4     I further certify that I am neither attorney
 5  nor counsel for, related to, nor employed by any of the
 6  parties to the action in which this testimony was taken.
 7  Further, I am not a relative or employee of any attorney
 8  of record in this cause, nor am I financially or
 9  otherwise interested in the outcome of the action.
10     Subscribed and sworn to on this the 27th
11  day of March, 2018.
12
13
14          _____
15          DEBBIE BOOTHE, CSR
           Texas CSR 4708
16          Expiration Date: 12-31-18
           Lexitas
17          Firm Registration No. 95
           13101 Northwest Freeway, Suite 210
18          Houston, Texas 77040
           281-469-5580
19
20  JOB NO. 355172
21
22
23
24
25
```

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3

     UNITED STATES OF AMERICA,    *
 4                                *
           Plaintiff,             *
 5                                *
     VS.                          *  Case No. 4:17-cv-01164
 6                                *
     CHRIS C. ULASI, MICHAEL      *
 7   UMEORAH, ANGELA UMEORAH      *
     NINA U. DENCHUKWU, and       *
 8   OCWEN LOAN SERVICING, LLC    *
                                  *
 9         Defendants.            *

10
                     REPORTER'S CERTIFICATION
11                    ORAL DEPOSITION OF
                        CHRIS C. ULASI
12                     MARCH 16, 2018

13           I, Debbie Boothe, Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16           That the witness, CHRIS C. ULASI, was duly

17   sworn by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20           I further certify that pursuant to FRCP Rule

21   30(f)(1) that the signature of the deponent:

22           __X__ was requested by the deponent or a party

23   before the completion of the deposition and returned

24   within 30 days from date of receipt of the transcript.

25   If returned, the attached Changes and Signature Page
```

1   contains any changes and the reasons therefor;

2           _____ was not requested by the deponent or a

3   party before the completion of the deposition.

4           I further certify that I am neither attorney

5   nor counsel for, related to, nor employed by any of the

6   parties to the action in which this testimony was taken.

7   Further, I am not a relative or employee of any attorney

8   of record in this cause, nor am I financially or

9   otherwise interested in the outcome of the action.

10          Subscribed and sworn to on this the 27th

11  day of March, 2018.

12

13

14  _____

        DEBBIE BOOTHE, CSR
15      Texas CSR 4708
        Expiration Date:  12-31-18
16      Lexitas
        Firm Registration No. 95
17      13101 Northwest Freeway, Suite 210
        Houston, Texas  77040
18      281-469-5580

19
    JOB NO. 355172
20

21

22

23

24

25